NORTHWEST MERCHANTS TERMINAL, Inc.
*v.* O'ROURKE ET AL.

[No. 176, October Term, 1947.]

172

*Decided July 20, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, *and* MARKELL, JJ.

*Lawrence B. Fenneman,* with whom was *Goldie R. Miller* on the brief, for the appellant.

*Wilson K. Barnes,* with whom were *Carman, Anderson & Barnes* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree enjoining defendant from erecting three warehouse buildings on the premises 1300 Ashburton Street, 1300 Dukeland Avenue and 1301 Ashland Street (at this location paper streets), and from using the premises for any uses other than those permitted by Ordinance No. 348, approved April 9, 1946, amending the comprehensive Baltimore Zoning Ordinance approved March 31, 1931. The principal question presented is the validity of Ordinance No. 348 as against defendant. The record is voluminous, the appendices comprise over 400 pages, but there is no substantial conflict in the evidence as to material facts.

. Defendant's property is approximately triangular in shape and contains six or seven acres. At the west side of Poplar Grove Street the southeast side of the Western Maryland Railroad right of way crosses the line (if extended) of an alley ninety feet north of Ellicott Drive, formerly Laurens Street. Arthur P. J. Von Nordeck, one of the plaintiffs, claims to be the "equitable owner" of the property 1315 Popular Grove Street (*Serio v. Von Nordeck*, 189 Md. 388, 56 A. 2d 41), which fronts on Poplar Grove Street from the railroad right of way to the alley and extends esatward about one hundred feet. Defendant's property includes all the property, except the Von Nordeck property, between the right of way and the alley, extending east about 1168 feet to Braddish Avenue (a paper street); it extends about 280 feet north on Braddish Avenue, from the alley to the right of way. It also includes a half-block (less a corner) about 130 by 200 feet, south from the alley to Ellicott Drive, east from Ashburton Street to Braddish Avenue; defendant does not now propose to erect a warehouse or (so far as appears) any other building on this half-block.

Poplar Grove Street crosses over the railroad by a viaduct. The Von Nordeck property is used as a tavern and a "club". It appears to be three storeys high, about one and one-half storeys below the level of the viaduct

and at or above the level of the railroad. On defendant's property, immediately adjoining the Von Nordeck property, are (and have been for over twenty years) a steel shed and an "open" shed, about 63 and 93 feet, respectively, by 30 feet. Alongside of the building (or buildings) is a disconnected spur track. The switch has been removed from the running track of the railroad; the siding is still there. This part of defendant's property formerly was owned by the late M. A. Long or his corporation, builders and contractors. The building was used for storage and the spur for bringing in machinery and materials. Von Nordeck, who says he was a tenant at 1315 Poplar Grove Street since 1932—or since 1939 (*Serio v. Von Nordeck, supra*), says the rest of the Long lot was never used by Long for storage but was used as a "children's playground", that before 1931 Long discontinued the use of the shed and spur and thereafter until 1945 no use was made of the shed by anybody. Testimony of a number of witnesses clearly indicates that the spur was used until ten or twelve years ago, the shed was used for storage in 1937, when Mr. Gilbert appraised the property, and both the sheds and the yard were used for storage of building materials by a Long tenant from 1940 till defendant's purchase in 1945. Plaintiffs' photographs illustrate the obvious unfitness of a yard between a railroad track, the rear of a saloon, a shed and an alley for use as a "children's playground."

The Western Maryland tracks from Poplar Grove Street east to Bentalou Street approximate an arc of a circle. The northernmost point in the arc is about 500 feet north of the northern boundry (Lorman Street) of St. Peter's Cemetery, *i. e.*, 600 feet north of the line (extended) of the alley north of Ellicott Drive. Curves northward from both the west and the east side of the arc unite and continue in a straight line north across North Avenue at and beyond Walbrook Station. The line of the alley (extended) runs east about 1750 feet to St. Peter's Cemetery and 1350 feet through the cemetery to an alley 100 feet west of Bentalou Street. The

land bounded by the railroad right of way on the north, the line of the alley and (after a line 100 feet north at the cemetery) Lorman Street on the south, and a few feet of the alley back of Bentalou Street on the east, thus approximates a segment of a circle. With the exception of the Von Nordeck property, the westernmost part (about one-third) of this segment is defendant's property (besides defendant's half-block south of this segment). The eastern two-thirds of this segment contains, along the railroad right of way, a number of industrial properties, including buildings for various purposes (*e. g.*, manufacture of cinder blocks), coal yards, trestles for the discharge of carloads of coal, and oil tanks for the discharge and delivery of oil; a building for the storage of roofing materials was recently destroyed by fire. One of these industrial properties is directly opposite the eastern boundary of defendant's property. This eastern two-thirds of the segment contains no unimproved land, along the right of way or elsewhere, comparable either in size or in railroad availability with defendant's part of the segment.

By the original 1931 Zoning Ordinance most of the property along either side of the Western Maryland right of way from Poplar Grove Street to Bentalou Street, for a considerable distance both north and south, was zoned as a Second Commercial Use District. The present Von Nordeck property (or almost all of it) was in a small First Commercial district, which extended south from the right of way about 500 feet to Winchester Street, east 100 and west 200 feet from Poplar Grove Street, and was surrounded by a Residential district (north and south of the railroad) on all sides except about ten feet at (or near) the present boundary between the Von Nordeck property and defendant's property. There is a still smaller, triangular First Commercial district between the right of way and the northern boundary of St. Peter's Cemetery (extended) about 100 feet on either side of Bentalou Street. South of the right of way the boundaries of the Second Commercial district ran east from

the Von Nordeck property through the sheds on defendant's property (about five feet from the north and twenty five from the south side of the sheds) about 365 feet to Dukeland Avenue, south 850 feet to an alley north of Riggs Avenue, east 1300 feet, north 225 feet to the corner of St. Peter's Cemetery, east 1300 feet and north 700 feet along the southern and eastern boundaries of the cemetery, and continued north about 100 feet to the right of way.

That part of the Second Commercial district south of the segment above mentioned thus comprised roughly two irregularly adjacent rectangles, the western about 850 by 1300 feet, the eastern (St. Peter's Cemetery) 700 by 1300 feet. The eastern half of the western rectangle, and also the property directly south of it in the Residential district, for half a mile or more south of the railroad, and a considerable part of the adjoining "residential" property south of the cemetery, is unimproved. In the rectangle and in the Residential district in all directions, over several hundred acres, practically all the houses are two story row houses, some of them very congested kinds of single family dwellings, with little or no yards, front or back. Both plats and plaintiffs' photographs indicate that the $22,000 value of the Von Nordeck property (*Serio v. Von Nordeck, supra*) represents the commercial utility of a saloon property and not value of light, air, view, æsthetic considerations or residential potentialities. The row houses on the north side of Ellicott Drive (2800 block) in the original Residential district between the First and Second Commercial districts seem to have small front porches and back yards. Those in the 2700 block, in the original Second Commercial district, have somewhat more space for yards and light and air.

Defendant, a Maryland corporation incorporated December 18, 1945, is a real estate subsidiary or affiliate of Lasting Products Company, which manufactures building materials and paints on Franklintown Road. Albert I. Rankin is president of both corporations. With re-

spect to defendant's property, Rankin and defendant have acted for Lasting Products. The property was purchased to allow Lasting Products to expand its operations. It had no adequate place for storage of its materials and needed additional facilities on a railroad siding. The property was purchased in Rankin's name for $12,-500 and was conveyed to him by two deeds dated July 2d and 3d, 1945. The western part (about half) was purchased for $6500 from the trustee under deeds and will of Long, by a contract dated May 14, 1945 conditioned upon (1) the fact that the entire property was zoned second commercial, except a strip thirty feet wide (zoned residential) extending along the southernmost edge west of Dukeland Avenue and (2) the buyer being able to get a letter from the Western Maryland Railroad saying it was "feasible from an engineering point" to install a railroad siding into the property. About June 15, 1945 physical possession was taken and several carloads of material and equipment were moved in. The property was conveyed by Rankin to defendant by deed dated December 28, 1945. On July 9, 1945 Rankin obtained from the City an occupation permit for use of the property at the rear of 2700 to 2756 Ellicott Drive for storage of Government surplus material such as tanks, building materials, etc., (no junk). Only a small part of the property was level, the rest was full of holes, gullies and depressions. He first borrowed a "bulldozer", later bought one about September or October, 1945, sent out circulars offering to accept "fill", and proceeded with leveling out one-fourth of the property, preparatory to erecting buildings on it, also to give more room to store materials. On August 23, 1945 Lasting Products obtained a grading permit for filling in subgrade below established alley and street grade, not more than 1000 cubic yards. The bulldozer was used on the property and grading done through 1945 and the first half of 1946. Rubbish was cleared up, trees cut down, undergrowth dug up and burned, and solid fill brought was levelled off. The shed was renovated. Cement work

was done. Electricity was put in the shed under a permit dated February 23, 1946. Water and sewers were installed (on application to the City) on part of Dukeland Avenue. As soon as the shed was vacated by the prior occupant, it was cleaned and filled with building materials and equipment and has been so used ever since. Rankin says approximately $50,000 (including the purchase price of $12,500) was expended for improvement of the property and in preparation for building.

The Planning Commission (Baltimore City Charter, 1946, secs. 102-122) has "full power to investigate and study land uses and zoning in the city, and the relation thereof to public and private development, and shall, from time to time, confer with the Board of Municipal and Zoning Appeals and, when the Commission deems it necessary, report and submit to the City Council amendments to the Baltimore City Zoning Ordinance." All amendments to the Zoning Ordinance, proposed and introduced into the Council, may be referred by the Council to the Commission for a report and recommendation, which shall state, *inter alia,* the reasons upon which the Commission's conclusions are based. Sec. 121. Early in 1945 the Commission made various studies of land uses in several areas. Where it found residential properties in a commercial district, especially second commercial, it sponsored ordinances, referring them to the Council, to rezone the property so used. It prepared and recommended an ordinance to amend the Zoning Ordinance by changing from the "Second Commercial Use District" to the "Residential Use District" the property between Dukeland Avenue, Riggs Avenue, Bentalou Street and Lorman Street, as outlined on accompanying plats. On October 24, 1945 this ordinance, number 518, was introduced in the Council and was referred to the Board of Zoning Appeals and the Planning Commission. The property covered by the ordinance comprised (as the plats show) St. Peter's Cemetery and the other rectangle (plus a strip thirty five feet north of the alley) above mentioned. A cemetery is a "residential" use, in the

sense that it is not prohibited in a residential district. The western half of the western rectangle (but not the thirty five foot strip) is almost completely occupied by two storey row houses like those in the surrounding Residential district. As has been said, the eastern half is unimproved.

The Board of Zoning Appeals approved the ordinance and in its report said: "The Board has examined the premises and studied the proposed change and its relation to the general zone plan, and finds that these blocks included in the ordinance lie between the Residential District to the south of St. Peter's Cemetery and the Western Maryland Railroad. If the Ordinance is passed there will be remaining considerable Second Commercial Zone adjacent to the railroad to serve such needs. It appears now that a portion of the land included in this Ordinance is just ready for residential development west of St. Peter's Cemetery." The Planning Commission also approved the ordinance and in its report said: "The Commission considered the contents of this ordinance at its regular meeting of November 7th, 1945, as well as the favorable report of the Zoning Committee, who had inspected the property. Properties embraced in this proposed use change are now used principally for residential purposes or are planned as such. It is logical, therefore, that the area be removed from the Second Commercial Use District." On November 13, 1945 the ordinance was referred to the Committee on Buildings and Building Regulations, on January 14, 1946 was reported favorably and read the second time, and on January 21, 1946 was placed on third reading and, with amendments offered from the floor, recommitted to the Planning Commission. The ordinance, as amended, approved April 9, 1946 as No. 348, bears endorsements "Advertised in The Sun paper, Nov. 30, 1945. Public Hearing, Dec. 17, 1945 at 4 P. M." The amendments offered January 21, 1946 enlarged the property covered, so as to include all "property between Dukeland Avenue, Riggs Avenue, Bentalou Street and the *right-of-way of*

*the Western Maryland Railway Company"* (italics sup-
plied), thus including the entire segment above men-
tioned, of which only the thirty-five foot strip running
west from the cemetery was covered by the ordinance as
introduced.

At the hearing on December 17, 1945, defendant's
counsel appeared before the City Council and made what
he calls "a formal objection", because the ordinance cov-
ered defendant's half-block (between Ellicott Drive and
the alley) and the thirty-five foot strip north of the alley.
On January 3, 1946 defendant filed three applications
for building permits for the erection of three storage
warehouses, to cost $72,000, $10,000, and $44,000 respec-
tively, at 1300 Ashburton Street, 1300 Dukeland Avenue
and 1301 Ashland Street, all beyond the proposed rezoned
Residential district. Neighborhood opposition to defend-
ant's proposed buildings resulted in delay in issuance
of permits, threats by neighbors to have the pending
ordinance amended and by defendant to compel issuance
of permits by mandamus, and efforts by the Planning
Commission to effect appeasement by mediation. As the
Commission's minutes of January 17, 1946 recite, a neigh-
borhood meeting with defendant's counsel "resulted in
no compromise." It was, however, agreed that submis-
sion of a zoning amendment to the Council by the neigh-
bors, and application for mandamus by defendant, be
deferred from January 14th to January 21st. It was
"noted" by the Commission that it had "arranged" with
defendant's counsel for defendant to make certain changes
in its plat, (1) not to show the building of a new rail-
road spur [east of Dukeland Avenue, beyond the existing
disconnected spur (?)], (2) to set the building further
back in the alley in the rear of 2700 block Ellicott Drive,
(3) that the two new structures in the rear of the 2800
and 2700 blocks be designated for storage purposes only
and manufacturing [not mentioned at all in the appli-
cations as changed] be confined to the buildings in the
vicinity of Braddish Avenue, (4) that the walls of the
buildings facing south have no windows or doors. "Since

it was developing into a bad neighborhood situation and the applicant is willing to make these changes, though he is not compelled to do so, as he is now within his legal rights", the Commission's chairman suggested that if defendant would make these changes the builder's plat be approved, "which would then obviate the filing of mandamus proceedings by the applicant against the City cf Baltimore". A motion was adopted by seven members of the Commission, the City Council member voting against it, that the secretary-engineer of the Commission be authorized to approve the builder's plat, "provided the applicant changes the plats as outlined above". The plats were accordingly changed and approved, and on January 21, 1946 the permits were issued.

On January 28, 1946 the ordinance, with amendments, was withheld on third reading. On February 4, 1946 the report of the Planning Commission was laid before the council. The report stated that: The Commission "reviewed the amendments after having inspected the properties to be changed as well as the neighborhood in general. It was found that the amended plat embraced a number of properties already engaged in Second Commercial enterprises along the south side of the Western Maryland Railroad right of way". A resolution was adopted by seven members of the Commission, the City Council member voting against it, that the Commission "disapprove the amendments to pending Ordinance No. 518 to include the commercial properties along the railroad in a Residential District, and reiterate its recommendations originally embodied in the Ordinance and the plats as prepared by this Commission." "In order to afford an opportunity for the Council to protect the neighborhood interests or wishes," another resolution was adopted by seven members of the Commission, the City Council member not voting, that the Commission "recommend to the Mayor and City Council that the plat as originally submitted by this Commission be amended so that the northerly boundary line of the area to be changed lying between Dukeland street and the westerly side of

St. Peter's Cemetery be modified by moving it 25 feet to the north and parallel to the alley in the rear of the north side of Ellicott Drive, in order to preserve for the residents of the neighborhood the concession which has been agreed to by the property owner that he would provide an additional setback from the northern side of the alley north of Ellicott Drive." The same day, February 4th, the ordinance was placed on third reading and the amendments adopted. On February 11th it was finally passed. On February 18th defendant's counsel wrote to the Mayor requesting that the ordinance be vetoed. The same day, February 18th, the passing vote was reconsidered and the ordinance was recalled from the Mayor and recommitted to the Committee on Buildings and Building Regulations. On March 11th it was reported favorably by the committee, withdrawn from the committee and finally passed. On April 9, 1946 it was approved, as Ordinance No. 348. It bears an endorsement, signed by the City Solicitor and initialed by his Deputy, "The proper steps appear to have been taken in the passage of the within Ordinance, and said Ordinance appears to be in proper form."

On May 3, 1946 plaintiffs' counsel, representing 237 "taxpayers or property owners", who "live in or own" 197 properties indicated, wrote to the Buildings Engineer "demanding" immediate revocation of defendant's permits on the ground that they were issued in violation of certain provisions of the Building Code. Of the 197 properties a majority were in the original Residential district not covered by the rezoning ordinance; none were within the railroad segment covered only by the amendment offered January 21, 1946. On the advice of the City Solicitor on June 19, 1946, the Buildings Engineer refused to revoke the permits. On May 31, 1946, and again on December 10, 1946 and January 23, 1947 defendant made applications to the Civilian Production Administration for authority to construct its three warehouses. These applications were denied on the ground that because of shortage of materials defendant's build-

ing would interfere with Veteran's Emergency Housing Program. On January 17, 1947 defendant made three L-shaped excavations, about fifteen feet by fifteen, which went down to solid ground and the next day were poured with concrete, as footways for the foundations of the three warehouses.

On August 31, 1946 plaintiffs, Von Nordeck and the owners of five properties in the 2700 or 2800 block on Ellicott Drive, filed their bill for an injunction and a declaration that defendant's three permits were void. On February 10, 1947 they filed a supplemental bill praying the same relief, alleging that defendant's permits were void for the additional reason that work had not been commenced within one year after date of issue. After hearing on the bills, answers, testimony and other evidence the court by its decree enjoined defendant as above stated.

In the railroad segment covered by the rezoning amendment offered January 21, 1946, there are no houses and, the evidence indicates, never have been and probably never will be any. Houses could be built there "if you could get anyone foolish enough to do it." Mr. Gilbert and Mr. Ferguson, real estate brokers, dealers and "developers" of long and wide experience, and also the present Terminal Engineer of the Western Maryland Railroad and its retired real estate agent (who had charge of the acquisition, from 1903 to 1905, of these rights of way for the Port Covington line), testify without contradiction that this property is (a) especially suited for industrial purposes [including "Second Commercial" uses] and (b) unsuited for residential purposes. The presence of the railroad is the chief reason, but not the only reason, for these characteristics. The land itself is "bad" for building houses. In constructing this line the railroad acquired the lowest grade property in order not to interfere with the development of higher property. Though Poplar Grove street crosses the railroad by overhead viaduct, the land east of Poplar Grove Street has a steep grade to the east. It is first level with the railroad

and then runs as much as 50 feet lower than the railroad. A gully running south (perhaps through the unimproved land west of the cemetery) has been a problem for years. Mr. Gilbert says defendant's property is worth $3000 to $4000 per acre for industrial purposes; he thinks defendant "rather got a bargain" at $12,500 for the whole. The half-block on Ellicott Drive, south of the railroad segment could be developed for residential purposes, but he would not give it a very high value; Mr. Ferguson values it at about $1300. Both say development of defendant's property within the segment for residential purposes would be a losing venture. Mr. Ferguson says he might give $1500 for the whole with the hope of some time getting it rezoned again. He thinks $4000 an acre for industrial purposes is cheap. Mr. Pannitz, a builder, plaintiffs' witness, says if he owned defendant's property he probably would use it for building residential properties, but "if [he] had to buy it [he] probably would not buy it"; it is more of an element of risk than an average piece of land he would look at; it is not properly adaptable to build houses and he would only build on it himself if he actually owned it and were "stuck" with it. He also says the property could be used for a warehouse with very little effect on neighboring property.

Von Nordeck testifies that, as president of the South Walbrook Improvement Association, he received on February 23, 1941 from a member of the association, who testifies that at that time he gave Von Nordeck, three signs which "gave notice of a public hearing on March 11th by the City Council" about the rezoning ordinance. Von Nordeck says he posted these signs, one on a building "right next to" Rankin, one "at Dukeland and Ellicott Drive", the third in front of St. Peter's cemetery. He does not know what has become of those signs; the one between his property and Rankin's building was torn down two days after they were posted.

Defendant contends that Ordinance No. 348 is invalid as against defendant because (1) notice of a public hearing in relation to the rezoning ordinance, as amended,

was not given by publication and posting as required by Art. 66B, secs. 4 and 5, and (2) the ordinance is (*a*) unreasonable, arbitrary and contrary to the provisions of Art. 66B, sec. 3 and (*b*) deprives defendant of its property without due process and denies it the equal protection of the laws. The second contention will first be considered.

Section 3 of the Zoning Enabling Act (Acts of 1927, Chapter 705, Art. 66B, sec. 3) provides, *inter alia*, with reference to zoning regulations, "Such regulations shall be made in accordance with a comprehensive plan and * * * with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality." The bill of complaint alleges, *inter alia*, that: Shortly after plaintiffs and other property owners in the vicinity of defendant's property "discovered that a portion" of defendant's property was not in a Residential Use District, "they decided to request the City Council * * * to amend pending Ordinance No. 518 to include" defendant's property "(as well as other areas) in a Residential Use District. This intention was well known" by Rankin at the time of the hearing of a zoning appeal on December 4, 1945, when the Board of Zoning Appeals found no "non-conforming manufacturing use" of the Long sheds, which were (to the extent of twenty-five out of thirty feet in width) in the Residential district under the original 1931 Zoning Ordinance. On January 21, 1946 "an appropriate amendment to proposed Ordinance No. 518 was introduced" into the Council "to include" defendant's property, "as well as other adjacent properties," in the area to be rezoned as Residential. The erection of defendant's warehouses "would create hazards to the health, safety and security of * * * the surrounding property owners * * * in that * * * by placing a Second Commercial Use in or near a predominantly Residential Use District, the surrounding residential properties will

be materially depreciated in value with a consequent general lowering of the character of the neighborhood as a desirable residential development."

The last quoted allegation apparently embodies a broad contention which cannot be accepted as a correct statement of either the facts or the law regarding zoning. Lines between use districts must be drawn somewhere. It is common knowledge that, long before zoning and ever since, residential neighborhoods have bordered on commercial or industrial neighborhoods. Sometimes the borders of restricted neighborhoods are protected from undesirable adjoining neighborhoods by landscaping or architectural plans. If a residential neighborhood desires protection by a border of unused property, necessarily it must provide its own property, not appropriate its neighbors', for this purpose. "In order to impose restrictions some valid exercise of the police power must be proven. But such power is invoked for the protection of the property restricted and not to give protection to surrounding property." *Chayt v. Maryland Jockey Club,* 179 Md. 390, 395, 18 A. 2d 856, 858. Property owners in a residential district cannot create a "no man's land" at the border of their own district by forbidding one property owner in an adjoining district from making any use at all of his property, or any use for which it is "peculiarly suitable"—especially when the adjoining district has been zoned for suitable uses for fifteen years.

In *Arverne Bay Const. Co. v. Thatcher,* 278 N. Y. 222, 232, 15 N. E. 2d 587, 591, 117 A. L. R. 1110, in holding invalid a New York City ordinance which changed undeveloped property from an unrestricted to a residential zone, the court, by Judge (later Chief Judge) Lehman, said: "We have already pointed out that in the case which we are reviewing, the plaintiff's land cannot at present or in the immediate future be profitably or reasonably used without violation of the restriction. An ordinance which *permanently* so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be rec-

ognized as a taking of the property. The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden." In *Phipps v. City of Chicago,* 339 Ill. 315, 327, 171 N. E. 289, 293 (cited and distinguished in *Chayt v. Maryland Jockey Club, supra,* 179 Md. at page 397, 18 A. 2d at page 859), in holding invalid an ordinance changing "from an industrial and commercial use classification to a residential use, imposing additional burdens and restrictions upon the property" (179 Md. at page 397, 18 A. 2d at page 859), which adjoined a railroad, the court said: "When appellant passed the original ordinance its powers were not exhausted. It could amend the ordinance. But the power to amend was not arbitrary and could not be exercised merely because someone wanted it done or thought it ought to be done. See *Bauernschmidt v. Standard Oil Co.,* 153 Md. 647; *Weinberg v. Kracke,* 189 Md. 275, 55 A. 2d 796, 799-800. It could only be exercised when the public good demanded or required that the amendment be made. When appellees bought the land they had a right to rely upon the classification which existed at the time the purchase was made. They also had a right to rely upon the rule of law that the classification would not be changed unless the change was required for the public good." "In *Dousey v. Village of Kensington, supra,* [257 N. Y. 221, at page 231, 177 N. E. 427, 86 A. L. R. 642], the plaintiff owned a piece of property upon the boundary of a village, which was adjacent to property beyond the boundary which might be used for apartments or business, and to restrict the plaintiff's property to residential purposes alone would reduce its value by about three-quarters; a zoning ordinance having that effect was held void as to his property, the court stating [in 257 N. Y. at page 231, 177 N. E. at page 430, 86 A. L. R. 642]: 'Certainly an ordinance is unreasonable which restricts property upon the boundary of the village to a use to which the property is not adapted, and thereby destroys

the greater part of its value in order that the beauty of the village as a whole may be enhanced." *Strain v. Mims*, 123 Conn. 275, 289, 290, 193 A. 754, 761. In *Vine v. Zabriskie*, 122 N. J. L. 4, 6, 3 A. 2d 886, 887, in holding invalid an ordinance, adopted after application for a permit for erection of apartment houses on property zoned for business and apartment houses, amending the zoning ordinance so as to prohibit the use of the property for apartment houses, the court said: "Clearly this was an eleventh-hour attempt to prevent this realtor from using her property for its highest use and for which it had been zoned for seven years. Such action was ill-advised, capricious and unreasonable. It was doubtless precipitated because of public excitement and clamor. Some of this opposition was likely based upon misinformation as to the plan of development contemplated. However that may be, we are satisfied that the result was an arbitrary interference with the lawful and legitimate use of private property." In *Western Theological Seminary v. Evanston*, 325 Ill. 511, 525, 156 N. E. 778, 784, in holding invalid an ordinance, adopted after property had been acquired—but not used—for building school buildings, amending a comprehensive zoning ordinance so as to exclude schools and colleges from "A" residence districts, the court said: "The question of the right of the city to exclude from the 'A' district schools and colleges in the first instance does not call for decision. They were not excluded until after the appellant, relying upon the terms of the ordinance, invested its funds in acquiring the right which the ordinance expressly permitted to be exercised. The destruction of that right when there is no appreciable danger to the public health, comfort, safety, or welfare to be feared from its exercise is clearly an arbitrary and unreasonable exercise of power which renders the amending ordinance void as to the appellant's property."

"The purpose of the zoning law is, of course, to devote general areas or districts to selected uses. 'The whole value of zoning lies in the establishment of more or less

permanent districts, well planned and arranged.' *Reg-feld v. City and County of San Francisco,* 218 Cal. 83, 85, 21 P. 2d 419, 420." *Ellicott v. Baltimore,* 180 Md. 176, 181, 23 A. 2d 649, 651, quoted in *Anne Arundel County v. Ward,* 186 Md. 330, 338, 46 A. 2d 684, 687, 165 A. L. R. 816. "The very essence of zoning is territorial division according to the character of the land and the buildings, their peculiar suitability for particular uses, and uniformity of use within the zone." *Heath v. City of Baltimore,* 187 Md. 296, 49 A. 2d 799, 804, citing *Anne Arundel County v. Ward,* 186 Md. 330, 341, 46 A. 2d 684, 165 A. L. R. 816, in which *Potts v. Board of Adjustment,* 133 N. J. L. 230, 43 A. 2d 850, was quoted. "On purely public or political questions regarding exercise of the police power, *e. g.,* regulation or prohibition of liquor traffic or race-track betting or passage of general building, traffic or zoning laws, legislators may follow the wishes of their constituents. Such action is not subject to judicial review. But in restricting individual rights by exercise of the police power neither a municipal corporation nor the state legislature itself can deprive an individual of property rights by a plebiscite of neighbors or for their benefit. Such action is arbitrary and unlawful, *i. e.,* contrary to Art. 23 of the Declaration of Rights and beyond the delegated power of the town of Denton to pass reasonable ordinances. [Citing cases.] There is no magic in the word 'zoning,' but there is a wide difference between exercise of the police power in accordance with a comprehensive zoning plan, which imposes mutual restrictions and confers mutual benefits on property owners, and arbitrary permission to A and prohibition to B to use their own property, at the pleasure of neighbors or at the whim of legislative or administrative agencies." *Benner v. Tribbitt,* 190 Md. 6, 57 A. 2d 346, 353.

The lower court in its opinion, and plaintiffs in this court, relied largely on *Anne Arundel County v. Snyder,* 186 Md. 342, 346, 347, 46 A. 2d 689, and cases there cited, as holding that (1) the presumption in favor of the

reasonableness of a zoning regulation prevails if the question is "fairly debatable" and (2) "a mere intention to use is not enough to establish a non-conforming use". No question of a non-conforming use is now presented, or would be material if the ordinance is invalid as against defendant. The presumption of reasonableness must be applied to the facts of the particular case. No doubt it applies to rezoning, as well as to original zoning in the Anne Arundel County cases, but not with the same weight. Indeed it creates a counter-presumption that zones are "well planned and arranged" and are to be "more or less permanent", subject to change only to meet genuine change in conditions. *Ellicott v. Baltimore, supra; Phipps v. City of Chicago, supra; Vine v. Zabriskie, supra; Strain v. Mims, supra,* 123 Conn. at pages, 280, 281, 286, 287, 193 A. at pages 757, 759, 760. It is unnecessary to elaborate the difference between zoning and rezoning. From the uncontradicted evidence, which has already been reviewed at undue length, as to the character, use and suitability for use of the property, the reports of the Zoning Board and the Planning Commission, plaintiffs' photographs, and the neighborhood campaign for the amendment, the conclusion is not "fairly debatable" that in rezoning the railroad segment covered by the amendment offered January 21, 1946, no "reasonable consideration"—nor any consideration at all—was given to "the character of the district and its peculiar suitability for particular uses" or to "encouraging the most appropriate use" of the land, or (so far as appears) to anything except gratifying the wishes of an organized neighborhood. From the photographs it is not easy to understand why neighbors should prefer a Dickens-like "children's playground" and an unkempt expanse of overgrowth and undergrowth to presumably well-built and properly managed storage warehouses. *Cf. Nectow v. Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842, a unanimous decision not long after *Euclid. v. Ambler Realty Co.,* 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016, and *Zahn v. Board of Public Works,* 274 U. S. 325, 47

S. Ct. 594, 71 L. Ed. 1074, all three cited in *Arundel County v. Ward, supra.*

In the bill of complaint and in argument, but without support in the evidence, plaintiffs assert that the streets, the peace and even the sleep of the neighborhood will be destroyed by heavy trucks carrying, day and night, defendant's wares to and from its warehouses. West Baltimore General Hospital is within half a mile of defendant's property, two schools on Poplar Grove Street and one South of St. Peter's Cemetery are more than half-a-mile away (by streets). Zoning regulations must be "designed to lessen congestion in the streets." Art. 66B, sec. 3. In making or changing such regulations traffic problems may be material considerations. "The peculiar hazard to school children" of a proposed filling station within 300 feet of the school grounds and 450 feet of the building may be one of the circumstances supporting the reasonableness of denial of a permit. *Mayor and City Council of Baltimore v. Bierman,* 187 Md. 514, 50 A. 2d 804, 806, 808, 809. But the hazard of defendant's warehouses (added to the existing industrial uses both north and south of the railroad) to schools half a mile away is fanciful. The most restricted residential neighborhoods are subject to through traffic of "heavy trucks", and also to local deliveries, *e. g.,* of oil and from retail stores.

Von Nordeck says he "always understood" defendant's property was in the residential zone and that "when Mr. Rosenthal sold that property to the people he gave them to understand it was in the residential zone and that piece of land back there would never be used for anything but a playground for the children of the neighborhood. That was the understanding of the neighborhood when they purchased those houses" [on Ellicott Drive, 2700 block]. There was no basis for any such "understanding." The Zoning Ordinance had been in effect since 1931. Rosenthal did not dedicate his own property, and could not dedicate Long's, for a playground. Von Nordeck also said (on defendant's objection the statement

was stricken out) that in 1948 the City is "going to build a playground from Ellicott Drive to Riggs Avenue", presumably in the unimproved land west of St. Peter's Cemetery, obviously a more suitable location than the railroad segment.

As we hold that Ordinance No. 348, as applied to the railroad segment covered by the amendment offered January 21, 1946, is unreasonable, arbitrary and contrary to section 3 of the Zoning Enabling Act, and is therefore invalid as against defendant, it is unnecessary to decide whether there was any failure to comply with the provisions of section 4 as to notice and, if there was, whether such failure invalidated the ordinance. As applied to the property originally covered by the proposed ordinance, the ordinance is not unreasonable or arbitrary. Whether it can be held valid as to part of the property and invalid as to part is a question not before us. Nor need we decide whether (as the lower court held) work under defendant's permits was not commenced within one year and the permits thereupon became void. Since the ordinance is not valid, there is nothing to prevent defendant from obtaining new permits. For the same reason, we need not pass upon plaintiff's original objections to the permits, which the City Solicitor said were "purely technical", *e. g.*, that the drawings with defendant's applications do not show all required toilet facilities or include enough copies. There is no evidence of any intent to violate the Building Code. See *Bauernschmidt v. Standard Oil Co.,* 153 Md. 647, 139 A. 2d 531; *Weinberg v. Kracke,* 189 Md. 275, 55 A. 2d 797, 799, 800. If the applications are technically defective in any respect (which we do not suggest), they can be amended.

*Decree reversed and bill dismissed, with costs.*