SPAID ET AL. *v.* BOARD OF COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY sitting as the District Council for the Maryland-Washington Regional District in Prince George's County

[No. 47, September Term, 1970.]

*Decided October 22, 1970.*

370

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Charles L. Richards* for appellants.

*Albert J. Lochte, Associate County Attorney,* with whom were *Lionell M. Lockhart, County Attorney,* and *Harry L. Durity, Deputy County Attorney,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The question presented to us in this appeal in a zoning case is whether the Circuit Court for Prince George's County (Mathias, J.) erred in affirming the refusal of the Board of County Commissioners of Prince George's County, sitting as the District Council for the Maryland-Washington Regional District in Prince George's County (District Council) to rezone the two parcels of land of the appellants involved in this case from the R-R (Rural Residential) zone to the I-2 (Heavy Industrial) zone because that refusal was arbitrary, unreasonable and capricious and denied the appellants as owners of the property due process of law. We have concluded that the lower court did err in affirming the District Council's action.

There are two tracts of land involved in the present case. They are both located on the Old Baltimore Washington Turnpike in close proximity to each other, but are separated by a small intervening parcel of land. They are in the same block and one of the appellants appears to have an interest in both properties. Both cases were heard together before the District Council and the cases were

consolidated and heard together before the lower court on appeal to that court.

One property is involved in Application No. A-6812, filed on July 14, 1966, which sought a reclassification from the R-R zone to the I-2 zone for 1.0325 acres. The applicant, Glen L. Spaid, one of the appellants, owned this 1.0325 parcel. The property is bounded on the east by the right-of-way of the Old Baltimore and Washington Turnpike, 80 feet wide, and has a frontage on that road of approximately 220 feet. On the north, the property line of approximately 216 feet adjoins the land of the Inter-City Industrial Center, Inc. and the westerly line of approximately 229 feet also adjoins the land of Inter-City Industrial Center, Inc. The southerly line of approximately 219 feet adjoins the land of James L. Bohrer, on which there is a single-family dwelling, a garage and a stable. Farther to the southwest is the Pressure Science, Inc. building. On the property involved in Application No. 6812 is a one-story single-family dwelling, a shingle garage and a frame stable.

The other property is involved in Application No. 6813. This application was filed on July 14, 1966 (the same filing date as Application No. A-6812), by its owner, Orndorff & Spaid, Inc., a Maryland Corporation, which sought a zoning reclassification from the R-R zone to the I-2 zone for 1.479 acres. This property is a rectangular property. For its easterly boundary, it has a frontage of approximately 401 feet on the Old Baltimore and Washington Turnpike. For its northerly boundary, it has a frontage of approximately 145 feet on the right-of-way of Ammendale Road, 70 feet wide. It is bounded on the west by a narrow strip of land, approximately 5 feet in width zoned R-R, to the west of which is land zoned I-2, for a distance of approximately 450 feet, and on the south by land zoned R-R. The land involved in Application No. A-6812 lies some 312 feet to the south of the land involved in Application No. A-6813. In Application No. A-6813 the property is a one-story, stucco and frame single-family dwelling and a garage.

With the exception of a buffer strip the entire area lying roughly between the tracks of the Baltimore and Ohio Railroad Company and the Old Baltimore and Washington Turnpike had been rezoned to the I-2 zone. The "buffer strip" measured 150 feet in depth from the westerly side of the Turnpike to the west and it extended south from a point somewhat north of Ammendale Road to Odell Road, also called by the intriguing name of Swampoodle Road, approximately 1400 feet south of the property involved in Application No. A-6812.

The Amended Report of the Technical Staff of the Maryland-National Capital Park and Planning Commission (Planning Commission), released May 24, 1968, considered both applications together. The Technical Staff recommended the denial of both applications and in the discussion in its report stated:

> "These two parcels of land are located within the area covered by the Fairland-Beltsville Master Plan, adopted Jan. 24, 1968, which proposes R-55 zoning for the subject properties and those in close proximity along both sides of Old Baltimore Pike. It is the intent of this report to include the proposals and text of the Adopted Plan as part of this report.

> "The proposals of the Plan and the ultimate recommendations of this report reflect the continued belief that industrial development should not encroach along this section of Old Baltimore Pike. It is believed that this encroachment would jeopardize existing and proposed residential areas for more intensive use. Previous zoning decisions have established a one lot set back (approximately 150 ft.) for industrial uses along Old Baltimore Pike as a buffer.

> "The industrial requests would, if granted, inject industrial frontage on Old Baltimore Pike. Although there is one such enterprise, Pressure Science, Inc., located a short distance to the

southwest of subject petition A-6812, it is set far off the main thoroughfare. Industrially zoned land is quite extensive in the area west of the subject petitions to the B & O Railroad. The industrial complex to the west has adequate industrial sites available, some with direct access to the railroad, to serve the needs of the area and county without jeopardizing residential areas of the county."

The Report assigned three reasons for the recommended denial:

"1. The requested reclassifications are *not* in accordance with the Fairland-Beltsville Master Plan, adopted January 24, 1968.

"2. Industrial zoning and development along this section of Old Baltimore Pike would jeopardize adjacent and nearby residential land for a more intensive use.

"3. There is adequate industrial land, in the form of an industrial complex with good highway and railroad access, both existing and proposed to the west of the subject parcels to serve the industrial needs of the area."

The Planning Commission on June 26, 1968, also recommended denial of the two applications giving the identical three reasons contained in the Report of the Technical Staff.

At the hearing before the District Council the applicants offered the testimony of two well-qualified experts, James F. Sheehan, a planning consultant for 22 years, and E. L. Dieudonne, Jr., a real estate broker and appraiser for 30 years, and a frequent expert witness in zoning cases.

Mr. Sheehan testified in regard to the subject properties and the properties in the general area. He stated that practically everything in the corridor between the Baltimore Boulevard and the Old Baltimore-Washington Turn-

pike "is an industrial use. There is practically no single family residential use, the whole thing looks like in the future it certainly will go at least industrial." He pointed out that there will be substantial residential traffic on Ammendale Road—an industrial road—and on a new proposed I-C road, so that the property involved in A-6813 at the corner of the Turnpike and Ammendale Road is "very undesirable use for the R-55 category," that is for "residential category." It was his opinion that the granting of the two applications to extend the I-2 zone to the Turnpike would not "adversely affect any of the residential property to the east, or to the southeast." In his opinion, it was most undesirable to have the most undesirable uses—those permitted in the I-2 zone—backed up to a residential zone. In his opinion no residences would ever be built facing the Turnpike and to attempt to use the 150 foot strip as a buffer was "not the proper thing." "I think here we could use the road as the buffer, everything to the east would be residential and everything to the west would be industrial." He further stated that "you will find in any master plan in the whole metropolitan area of Washington that an arterial highway is used as a separation between zones." He further testified that in his opinion no one "could possibly build a residential home in that area at all." In his opinion the 80 foot road—the Turnpike would provide a more reasonable buffer between the area between the commercial properties and the residential to the east and that "this type of buffer is commonly used in many master plans."

Commissioner Baggett, during Mr. Sheehan's direct examination, volunteered that the "buffer zone" was not established so that residential homes could be built on it. He stated:

> "This buffer zone was set up as a buffer zone to protect the people on the east side from any intrusion whatsoever from the industrial."

Counsel for the applicants then asked Commissioner Baggett:

"Q. Are you saying that it was set up as a buffer strip to protect the people on the other side of the road by using the residential as a buffer strip."

To which question the Commissioner replied:

"By using that property. It was in a non-building, commercial zone. That is what they were willing to give to get their zoning, they do it at every zoning, they give you a hundred feet, they give you a zoning to protect the other people's rights. These other people are entitled—if they were entitled to it ten or twelve years ago they are entitled to it now."

Mr. Dieudonne testified that the closest modern house to the subject properties "is about a half mile to the south, there are no houses to the north." In his opinion, the proposed uses would have "no adverse effect on neighboring uses, there are no adjacent residential uses, and properties adjoining to the northwest and to the south are already being used industrially, and neighboring uses are dominated, as we have already seen, by industrial use. So I can't see how the zoning could have any different effect, other than to upgrade some of the older industrial properties found around there." He then stated:

"I realize, * * * that there are many parcels of land along here which have conformed to this setback. But today, gentlemen, we are talking about two particular pieces of property, one of which lies entirely within the buffer strip, the other one roughly one-half within the buffer strip.

"It seems to me that if you had those parcels such as Mr. Ewing's and those along to the south they could well afford the buffer strip. But as a practical matter, this one particular one is completely within it, and seemed to preclude its use."

Commissioner Baggett then stated:

> "We set the whole thing up to preclude the uses, that is what your point is that you have to make to us, how we can take that out."

Mr. Dieudonne then testified that he had "looked over the plan, not only the Fairland-Beltsville plan but all other master plans in Prince George's County, it became very clear that those arterial roads have one zone on one side and one zone on the other side. But I have yet to see a buffer zone buffering property on one side by property on the other side." He further stated that if the subject properties were zoned R-55 and it was attempted to build a house there, it was his opinion that it would not be other than "an economic casualty."

Commissioner Baggett then stated:

> "I do not think there is any question in our mind that that is why we set it up, to cause an economic casualty that started to determine something that was set aside by buffer strip for protection of property on the east side."

Counsel for the applicants then stated:

> "I think he is talking about R-55 residential homes."

To which Commissioner Baggett replied:

> "We don't care, that was the only category we do set up it. That was the lowest. We put it R-55, and we said it was going to have to delete this from this other piece of zoning which was granted."

Counsel for the Applicants then stated:

> "Even if it could not be used as R-55?"

To which the Commissioner replied:

> "We did not want it to be used. Nowadays we

make it a lot smaller than the law calls for to build on so you cannot use it."

When asked whether the subject properties could, in his opinion, be used for R-55 zoning, Mr. Dieudonne replied that they could not be so used because:

"I don't think you could get a loan on that, Mr. Francois. I am on the VA staff and the FHA staff, and I believe that there would be enough adverse influence brought about by an industrial corridor of this size plus widening of that road to preclude financing of VA or FHA.

"Now, in this type neighborhood and this area I believe you have to build a lower priced house. A lower priced house would be served today 100 per cent or better by Government financing."

When asked by Vice Chairman Francois if it were possible for a person who had the money to build a house on the subject properties, Mr. Dieudonne replied:

"If you had all cash and wanted to build a house on it you could build a house on it, in my opinion. In my opinion as an expert, which is what I was asked, I believe it would be an economic casualty. And Mr. Baggett agrees."

On cross-examination, it appeared that the Pressure Science Laboratory had *agreed* to a 150 foot setback and that other property owners having large tracts of land had voluntarily setback their buildings beyond the 150 foot buffer. Apparently two-thirds of the industrial corridor, however, had no setback of 150 feet, the buffer extending from "a little to the north of Ammendale Road and to the south of Ammendale Road to Odell Road."

Mr. Dieudonne was also of the opinion that the master plan was in error in regard to the proposed R-55 recommended classification of the subject properties.

James Redmon, an employee of the Planning Commission, testified that the Planning Commission had recom-

mended disapproval of the applications for the three reasons already set forth, and that the strip of R-55 zoning to the west of the Turnpike was to "provide a buffer strip." He stated that the purpose of the buffer strip was, "[t]o protect the residential properties along the east side of the borderline."

Two property owners appeared in opposition to granting the applications but stated no reasons for their opposition. One introduced a letter from the Beltsville-Vansville District Citizens' Association, Inc., signed by its president, addressed to the District Council, which stated:

> "We oppose the requested I-2 zoning above as it would be detrimental to the surrounding residential neighborhood. We agree with the recommendation of R-55 for this area."

Counsel for the protestants brought out that there was no objection to industrial rezoning that conformed to the 150 foot setback. In his closing statement to the District Council, counsel for the applicants argued that a denial of rezoning would in effect deny the applicants the use of their property; that the expert testimony indicated that the Turnpike was itself the proper buffer; and that it was improper for the 150 foot strip to be used as a buffer. He then stated, that *in any event,* if the District Council saw fit to deny on the basis of the buffer concept, that it consider Application No. A-6812 to grant the requested rezoning for the portion of the land involved in that application lying to the west of the 150 foot line.

On December 20, 1968, the District Council passed two resolutions in regard to the respective applications. In regard to Application No. A-6812, the application was "approved for I-2 for .4731± acre (20,610± square feet), being that portion of the property which lies west of the 150-foot buffer strip, and approved for R-55 for .5594± acre."

In regard to Application No. A-6813, the application was "disapproved for I-2, but approved for R-55 for

1.479± acres, in accordance with the recommendation of the Park and Planning Commission."

The applicants filed timely appeals to the lower court from these actions by the District Council. The two cases were consolidated by the lower court and heard together. The lower court was of the opinion that the actions of the District Council were not arbitrary, unreasonable or capricious, but were fairly debatable, and the court should not substitute its judgment in regard to where to draw the zoning line for that of the District Council. It signed an order February 12, 1970, affirming the actions of the District Council and dismissing the Petitions for Review. A timely appeal was taken from this order to this Court by the applicants.

Before considering the principal question involved, the appellee, District Council, suggests that the appeal should be dismissed as to Application No. A-6812 because the District Council "gave petitioners exactly what they requested" and further that because of this, the applicant in Application No. A-6813 cannot dispute the continuance of the buffer strip so that the appeal in regard to Application No. A-6813 should also be dismissed. We do not agree with this contention. Counsel for the applicants made it entirely clear in his argument to the District Council that the requested reclassification for R-R to I-2 in both applications should be granted and to fail to do this would unlawfully deprive the applicants of the use of their respective properties. He did state, as we have indicated, that if the District Council decided to reject his position in this regard, in any event, it should grant the requested I-2 zoning for the portion of the property lying outside and west of the 150 foot buffer strip. We do not interpret this action of counsel as in any way abandoning his primary position, but merely as a proper attempt to obtain for his client part of the requested relief even if the District Council should, in his opinion, act improperly in regard to the rest of the relief sought. In our opinion, there was no abandonment by counsel for the applicants of his primary position and request for

reclassification of all of the subject properties and there is no estoppel against the applicants in this regard. See *Brown v. East Side Nat'l. Bank of Wichita*, 196 Kan. 372. 411 P. 2d 605 (1966) ; *Hundley v. Hundley*, 291 S.W.2d 544 (1956). For a discussion of the concepts of waiver and estoppel, see *Travelers v. Nationwide*, 244 Md. 401, 413, 414, 224 A. 2d 285, 292, 293.

We now turn to the principal question in the case; and, as we have indicated, we have come to the conclusion that the lower court was in error in affirming the actions of the District Council in denying the I-2 reclassification for all of the land involved in both applications. The District Council's actions, in our opinion, were arbitrary, unreasonable and capricious in view of the testimony in this case and resulted in a taking of the property of the applicants without due process of law.

This conclusion is required, we believe, by the decision of our predecessors in *Hoffman v. Mayor & City Council of Baltimore*, 197 Md. 294, 79 A. 2d 367 (1951). The *Hoffman* case is quite similar in many ways to the present case. In that case, the applicant owned property lying partly in a residential zone and partly in an industrial zone. The portion of the property there in question consisted of 43.350 sq. ft. of vacant land located in the area designated for residential use by Baltimore City Zoning Ordinance No. 1247 approved March 30, 1931. It bordered Fourth Street for 120 ft. on the east and extended back 363 ft. 2 in. to a vacant lot in an industrial zone on the west. On the south was a vacant lot zoned residentially and Arsan Avenue. South of Arsan Avenue were seven homes fronting on Maude Avenue, with their rear toward Arsan Avenue. On the north and west of the property the land was in an Industrial Zone. The applicant in *Hoffman* discovered before settlement for the purchase of the land in question that it had been zoned for residential use in 1931 when the comprehensive Baltimore City Zoning Ordinance was passed. The applicant in *Hoffman* applied for a special exception to use the land zoned residentially for the storage of building materials

in connection with his similar use of the land to the north, zoned industrially. The Zoning Commission denied the application. On appeal to the Board of Municipal and Zoning Appeals, three members of the Board voted to grant the application, two to deny it. Since an affirmative vote of four members of the Board is required to review action of the Zoning Commission, the appeal was refused..

At the hearing before the Board, an expert testified for the applicant that the most suitable use of the land in question was for industrial use and that it was unreasonable for it to be zoned for residential use. He stated "that someone could build a house thereon as there was enough area, but it would be unwise and wasteful use of the land." He further testified that zoning the land for industrial use "would not have any substantial effect on the value of the residences on Maude Avenue and would not in any way jeopardize the health and safety of the surrounding property." Another expert testified that although houses could be built on the land in question " 'no right minded speculative builder would dare build a house there because his market price would be less perhaps actually than his cost,' " and, further, that the proposed use would not jeopardize the safety or welfare of the immediate community and that the existing residential zoning was injurious to the owners of the tract. An owner and occupant of one of the residential properties on Maude Avenue protested against the granting of the application stating, in effect, that if a house built on the lot would be depreciated, why would not a house on Maude Avenue be depreciated. Curiously enough, a member of the City Council of Baltimore who appeared in opposition to the granting of the application stated that the City Council had tried " 'to change some of the areas so there may some day be a buffer between the residential and the industrial sections' " and further that " '[t]his is one of those particular cases where we had hoped something may develop there.' "

The Baltimore City Court affirmed the denial of the Board; but on appeal to this Court, the order of the Bal-

timore City Court was reversed, Judge (later Chief Judge) Henderson and Marbury, C.J. dissenting.

Judge Collins, for the majority of the Court, after reciting well established Maryland law that the mere fact that the present zoning makes the property less profitable is not sufficient ground alone to change the zoning and that if the drawing of the zoning line was "fairly debatable" the Court would not substitute its judgment for that of the legislative body, stated:

> "It was recently said in the case of *Northwest Merchants' Terminal, Inc. v. O'Rourke,* 191 Md. 171, 187, 60 A. 2d 743, 751, 'Lines between use districts must be drawn somewhere. It is common knowledge that, long before zoning and ever since, residential neighborhoods have bordered on commercial or industrial neighborhoods. Sometimes the borders of restricted neighborhoods are protected from undesirable adjoining neighborhoods by landscaping or architectural plans. If a residential neighborhood desires protection by a border of unused property, necessarily it must provide its own property, not appropriate its neighbors' for this purpose. "In order to impose restrictions some valid exercise of the police power must be proven. But such power is invoked for the protection of the property restricted and not to give protection to surrounding property." *Chayt v. Maryland Jockey Club,* 179 Md. 390, 395, 18 A. 2d 856, 858. Property owners in a Residential district cannot create a "no man's land" at the border of their own district by forbidding one property owner in an adjoining district from making any use at all of his property, or any use for which it is "peculiarly suitable"—especially when the adjoining district has been zoned for different suitable uses for fifteen years.' "
> (197 Md. at 301, 79 A. 2d at 370.)

Judge Collins cited with approval *Arverne Bay Construction Co. v. Thatcher,* 278 N. Y. 222, 15 N.E.2d 587, 117 A.L.R. 1110, as well as *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842.

The following quotation from the Court's opinion in *Hoffman* is particularly relevant to the facts in the present case:

> "It is admitted by a member of the City Council that the part of the lot in question was zoned as a 'buffer' between the residential and the industrial sections and the Board so found. This is not a valid reason for residential zoning. *Northwest Terminal, Inc. v. O'Rourke, supra,* 191 Md. 187, 60 A. 2d 743. The division line between the zones in this case is not 'fairly debatable'. *Board of County Com'rs of Anne Arundel County v. Snyder, supra,* 186 Md. 346, 46 A. 2d 689; *Francis v. MacGill, supra.* All the testimony here shows that to build residences on the lot here in question would be an unwise and wasteful use of the land. *Arverne Bay Construction Company v. Thatcher, supra.* All the testimony here shows that if the permit here sought is granted the public health, safety, and morals or general welfare of the community or surrounding property will not be jeopardized. *Nectow v. City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842, *supra.*"

(197 Md. at 304, 79 A. 2d at 371-372.)

\* \* \*

> "The evidence in this case is not conflicting or hard to interpret. As hereinbefore stated, the only tangible reason given in support of the board's minority veto is the establishment of a 'buffer' to protect the residences on Maude Avenue. This is no more lawful in original zoning than in re-zoning. *Northwest Merchants' Terminal v. O'Rourke, supra.*"

(197 Md. at 307, 79 A. 2d at 373.)

It may be added that substantially all of the arguments of the District Council presented to us in its brief and at argument were considered in the dissenting opinion of Judge Henderson, but, as indicated, were rejected by a majority of the Court.

It is quite apparent that the facts in *Hoffman* are similar to the facts in the instant case. It is an unusual case in which this Court must find that the existing zoning does deprive the property owners of any reasonable use of their property and that the legislative body's action is arbitrary, unreasonable and capricious and results in a taking of property without due process or for a public use without the payment of just compensation, but the case at bar, like the case in *Hoffman* is, in our opinion, one of those rare cases. As Judge Collins further stated in *Hoffman*:

> "The mere fact that an exercise of the police power may cause expense or loss to an individual does not overcome the presumption of validity. But the duty of the courts not to substitute their judgment for the judgment of legislative or adminstrative authorities acting within their powers is no more imperative than the power and duty to set aside any purported exercise of such power which is in fact arbitrary, capricious or confiscatory. In this respect zoning can no more escape judicial review than any other purported exercise of the police power. The legal question is whether the legislative or administrative determination was 'an unreasonable, arbitrary or unequal exercise of power'. But when it is shown 'that the health, safety, convenience and general welfare of the inhabitants of the part of the city affected will not be promoted' by inclusion of land in a residential district, thereby inhibiting its use for commercial and industrial purposes to the serious damage of the owner, such zoning may be set aside. *Nectow*

> *v. Cambridge*, 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842, *supra; Anne Arundel County v. Ward*, 186 Md. 330, 338, 46 A. 2d 684, 165 A.L.R. 816; *Northwest Merchants' Terminal v. O'-Rourke, supra.*"
>
> (197 Md. at 306, 79 A. 2d at 372-373.)

See also *Benner v. Tribbitt*, 190 Md. 6, 57 A. 2d 346 (1948) and *Cassel v. Mayor & City Council of Baltimore*, 195 Md. 348, 73 A. 2d 486 (1950).

This Court has distinguished the *Hoffman* case in subsequent cases—see *Bruning Bros. v. Mayor & City Council of Baltimore*, 199 Md. 602, 87 A. 2d 589 (1952) and *County Council for Montgomery County v. Gendleman*, 227 Md. 491, 177 A. 2d 687 (1962)—but the decision in that case has never been overruled and represents the Maryland law where applicable.

This Court has cited *Hoffman* with approval and has followed it in several subsequent cases. See *Hedin v. Board of County Commissioners of Prince George's County*, 209 Md. 224 at 232, 120 A. 2d 663 at 667 (1956); and *Mayor and Council of Rockville v. Cotler*, 230 Md. 335 at 340, 187 A. 2d 94 at 97 (1963). See also *England v. Mayor and Council of Rockville*, 230 Md. 43 at 47, 185 A. 2d 378 at 380 (1962), the opinion for a unanimous Court being written by Judge Henderson who dissented in *Hoffman, supra*. The decisions of this Court in *Hedin*, *Cotler* and *England, supra*, also support our decision in the instant case. As Chief Judge Brune, for the Court, aptly stated in *Cotler, supra*:

> "Here we think that the action of the City which purported to be and, we think, was rezoning was arbitrary, discriminatory and unreasonable. It flew in the face of facts developed at the hearing and, without any showing of adequate cause therefor, it deprived the appellees of the use of part of their property for which it was best suited. Here we find elements of a decision being based upon a plebiscite of neigh-

bors, which is not permissible (*Montgomery County Council v. Scrimgeour,* 211 Md. 306, 313, 127 A. 2d 528; *Benner v. Tribbitt,* 190 Md. 6, 57 A. 2d 346) ; of a decision not based upon evidence, which is also not permissible (*Hedin v. Board of County Commissioners of Prince George's County,* 209 Md. 224, 233-36, 120 A. 2d 663) ; and finally, and here perhaps most important of all, of an effort to create a no man's land or buffer zone in property of the appellees for the benefit of others by preventing the appellees from using their property for any of the purposes for which it is peculiarly suitable. That, too, is not permissible. *Northwest Merchants Terminal, Inc. v. O'Rourke,* 191 Md. 171, 187, 60 A. 2d 743; *Hoffman v. City of Baltimore,* 197 Md. 294, 79 A. 2d 367; *Hedin v. Board of County Commissioners of Prince George's County, supra,* 209 Md. 224, at 232. The cases last cited are, we think, controlling here." (230 Md. at 340, 187 A. 2d at 97.)

As in *Hoffman* the testimony in the case at bar indicated that the land was suitable for industrial, not residential use, and that the property owner was deprived of *all* reasonable use of the subject properties by the proposed R-55 residential zoning. It may be observed that neither the Technical Staff, the Planning Commission nor the District Council considered the R-R zoning in which the properties were placed in the original comprehensive zoning suitable for those properties. The *R-55 zone* was recommended and finally adopted by the District Council for all of the land lying in the 150 foot buffer strip. This action, in a sense, sought to overcome the *obvious* impossibility of developing the subject properties in the R-R zone with its requirement of a minimum of 15,000 square feet with an average of 20,000 square feet for the residential lot size. It would at least be *possible* to erect a single-family dwelling in an R-55 zone, with its requirement of 6,500 square feet for the residential lot size, but

the testimony is clear to us that this use and the other uses permitted in the R-55 zone are not reasonable uses for the subject properties. The property owners are deprived of *all* reasonable use of their property in the 150 foot "buffer strip" and this distinguishes the instant case from our decisions in *Bauserman v. Barnett*, 257 Md. 258, 262 A. 2d 521 (1970) ; *Montgomery County v. Laughlin*, 255 Md. 724, 259 A. 2d 293 (1969) ; *Montgomery County Council v. Kacur*, 253 Md. 220, 252 A. 2d 832 (1969) ; *Tauber v. Montgomery County Council*, 244 Md. 332, 223 A. 2d 615 (1966) ; and, *Mayor and City Council v. Borinsky*, 239 Md. 611, 212 A. 2d 508 (1965), and earlier cases cited in the *Borinsky* opinion.

Nor does the Report of the Technical Staff recommending a denial of the application make the issue "fairly debatable" which is the usual solution. See *Franklin Construction Co. v. Welch*, 251 Md. 715, 248 A. 2d 639 (1968) ; *Montgomery Co. Council v. Kacur*, 253 Md. 220, 252 A. 2d 832 (1969) ; and *Montgomery County Council v. Shiental*, 249 Md. 194, 238 A. 2d 912 (1968).

On the face of that Report, itself, it appears that the 150 feet in question had been established as a "one lot setback" by previous zoning decisions "as a buffer" to protect the "existing and proposed residential areas" from more intensive use. This is precisely what our prior decisions have held may not be done, so that the Technical Staff Report in this case does not make the issue fairly debatable and distinguishes the present case from the cases above mentioned. Cf. *Montgomery v. Board of County Commissioners for Prince George's County*, 256 Md. 597, 603-04, 261 A. 2d 447, 451 (1970).

We might add that the use of the phrase "buffer strip," like the use of the phrase "spot zoning," is perhaps an unfortunate usage as there may be lawful "buffer zones" and lawful "spot zones" as well as unlawful ones. See *England v. Mayor & Council of Rockville*, 230 Md. 43, 46, 47, 185 A. 2d 378, 380 (1962), *supra,* where Judge (later Chief Judge) Henderson stated for the Court:

" 'Spot zoning' is a descriptive term, and may

be valid or invalid, dependent upon the facts of the particular case. *Hedin v. Board of County Commissioners of Prince George's County,* 209 Md. 224, 232; *Hewitt v. County Commissioners of Baltimore County,* 220 Md. 48, 57. Usually it has been invoked against piecemeal exceptions to a comprehensive plan. But it has been said that where 'the ordinance is confiscatory in its application, it is not spot zoning to reclassify the property for a use to which it may be adapted'. 1 Rathkopf *Law of Zoning and Planning,* (3d ed.) p. 26-18. See also *Offutt v. Board of Zoning Appeals,* 204 Md. 551, 561. Here, as in the *Offutt* case, a number of circumstances justify a change of classification. There was clear evidence of original mistake or change of condition, in addition to the evidence of practical inability to improve the lots for residential use, and that the granting of the application would conform the use to the recommended future use of the whole area, as set out in the proposed comprehensive plan. Cf. *West Ridge, Inc. v. McNamara,* 222 Md. 448, 454 *et seq.* Moreover, there was already an industrial use of the large tract across the street, and other industrial uses in the neighborhood. There was not sufficient evidence to the contrary to make the issue fairly debatable. Under the circumstances, benefit to the neighboring residents is not a proper test. Restrictions imposed under the police power must be related to the general welfare and cannot be supported on the basis of benefit to surrounding property. See *Hoffman v. City of Baltimore,* 197 Md. 294, 301, and cases cited."

There may well be a "transitional zone" of a less intensive use properly placed by the legislative body between a residential use district and a district permitting commercial or more intensive uses, but only if it does not

deprive the property owner of *all* reasonable use of his property.

> *Order of February 12, 1970, reversed, and case remanded to the Circuit Court for Prince George's County with directions to remand the case to the District Council with directions to grant, in full, the applications of appellants for reclassification of their properties to the I-2 zone, the costs to be paid by the appellee, District Council.*