# MAYOR AND CITY COUNCIL OF BALTIMORE
## ET AL. *v.* BORINSKY

[No. 385, September Term, 1964.]

612

614

*Decided August 2, 1965.*

The cause was argued before HAMMOND, HORNEY, MAR-
BURY, OPPENHEIMER and BARNES, JJ.

*Simon Schonfield, Assistant City Solicitor of Baltimore,* with
whom were *Joseph Allen, City Solicitor,* and *Ambrose T. Hart-
man, Deputy City Solicitor,* on the brief, for the appellants.

*Edward Azrael,* with whom were *Azrael & Gann* on the brief,
for the appellee.

OPPENHEIMER, J., delivered the majority opinion of the
Court. BARNES, J., dissents. Dissenting opinion at page 628,
*infra.*

The Mayor and City Council of Baltimore (the City) has
appealed an order of the Baltimore City Court reversing the
action of the Board of Municipal and Zoning Appeals of Balti-
more City (the Board) which denied the Appellee's applica-
tion to construct an office and warehouse building on her prop-
erty in a Residential Use District.

I

The Appellee has filed a motion to dismiss the City's appeal

on the grounds that, although the order for appeal was entered on behalf of both the City and the Board, the appeal is, in fact, the appeal of the Board; that the order for appeal to this Court was not approved by the Mayor as provided for by the Baltimore City Charter; and that the City is not properly a party to this cause.

When the Appellee filed her Motion of Appeal to the Baltimore City Court from the resolution of the Board, she made both the Board and the City parties defendant. Both the City and the Board, through the office of the City Solicitor, filed an answer to the Appellee's petition in support of her Order of Appeal. Judgment was made absolute for the Appellee in the Baltimore City Court on November 10, 1964. On the same day, the Board, by majority action, voted to have its Chairman and Executive Secretary write to the City Solicitor or meet with him to request that an appeal be taken from the order of the Baltimore City Court to this Court. On November 12, 1964, the Chairman of the Board wrote to the City Solicitor giving reasons why, in the opinion of the Board, an appeal "must be taken." Section 65 of the Baltimore City Charter (1946) states that the City Solicitor is the legal advisor of the City and its several departments, commissions and boards. Section 66 of the Charter provides that no appeal shall be taken except upon written order of the City Solicitor, approved by the Mayor. An Order of Appeal was filed in the Baltimore City Court, signed by the City Solicitor and an Assistant City Solicitor, on November 23, 1964. As of that date, (admittedly, the letter was actually written on December 9), the Mayor wrote to the City Solicitor approving the entering of this appeal. The Mayor's letter was not filed in the Baltimore City Court and did not accompany the Record when it was sent to this Court, but was sent directly to the Clerk of this Court and was received by him on December 10, within the 30 day period from the entering of the final judgment in the court below.

The City, in the argument before us, conceded that the Board is not a proper party to an appeal which involves its own decision. The Board is an administrative body which has no official interest in the matters which come before it other than to decide them according to the law and the proved facts. *Nuova*

*Realty Co. v. City of Baltimore,* 197 Md. 266, 272, 78 A. 2d 765 (1951); *Zoning Appeals Board v. McKinney,* 174 Md. 551, 562, 199 Atl. 540 (1938).

The City, however, is clearly a proper party in these proceedings. The zoning ordinance is an exercise of the City's police power. *Grant v. City of Baltimore,* 212 Md. 301, 314, 129 A. 2d 363 (1957); *Jack Lewis, Inc. v. Baltimore,* 164 Md. 146, 153, 164 Atl. 220 (1933); *Tighe v. Osborne,* 150 Md. 452, 456-57, 133 Atl. 465 (1926). The City has a legitimate interest in the effectuation of its policies.

In *Mayor & C. C. of Baltimore v. Shapiro,* 187 Md. 623, 51 A. 2d 273 (1947), we overruled a motion to dismiss an appeal which the City had filed, as here, from an order of the Baltimore City Court reversing an action of the Board. In that case, Judge Henderson, for the Court, referred to the provisions of the Enabling Act, Code Article 66 B, Section 7, which provide for an appeal from any decision of the Board, by any person, officer, board or bureau of the municipality, and said, at 187 Md. 627, "we cannot say that * * * the City has no legitimate interest in the subject matter or outcome of the litigation, even if such inquiry were open under the unqualified provisions of the statute." See also *Town of Berwyn Heights v. Rogers,* 228 Md. 271, 280, 179 A. 2d 712 (1962).

The Appellee contends that the City should not have been named as a party in the appeal to the lower court from the Board's decision, and that she should have merely filed a Petition for Review, as the Enabling Act provides. The City answers that, the Appellee having made it a party, she has no standing now to question her own act. If the City had not been joined as a party defendant, it would have had the right, on petition, in the court below, to be made a party because of its interest. Having been made a party by the Appellee, its right to appeal from the order below is clear.

The Appellee further contends that her motion should be granted because, in fact, the City is only appealing on behalf of the Board, which had no right to appeal. The contention is answered in *Mayor & C. C. of Baltimore v. Shapiro, supra.* There, it was alleged in the motion to dismiss that the City had simply consented to permit the appeal to be prosecuted in its

name for the benefit of and at the expense of certain private parties. We refused to inquire into the City's motives for taking the appeal, and said, at 187 Md. 627, we did not regard the fact that private persons, denied the right to intervene for the purpose of appeal, had agreed to reimburse the City for costs, as controlling. We said: "Whether a particular case should be appealed * * * must rest in the sound discretion of the City authorities."

The fact that the Board joined in the appeal to this Court, when it was not a proper party, is immaterial. If, as here, one of the parties to the appeal has legal standing, that is sufficient. *Windsor Hills Improvement Association, Inc. v. M. & C. C. of Baltimore,* 195 Md. 383, 73 A. 2d 531 (1950).

It is immaterial also, in our view, that the necessary approval of the appeal by the Mayor was not filed with the original order of appeal and was filed in this Court instead of below. The purpose of the requirement in the Charter is to show that the appeal was authorized by the Chief Executive of the City. That authorization was made manifest within the necessary 30 day period. That the Mayor's letter was filed with the Clerk of this Court instead of below, and that the letter was pre-dated, like the language of the Board intimating that an appeal must be taken, are unimportant trivia. There was compliance with the substance of the statutory requirements, and, if there were technical irregularities, the Appellee was in no way prejudiced. See *Irvine v. Montgomery Co.,* 239 Md. 113, 210 A. 2d 359 (1965) and *Board of Co. Comm. v. Kines,* 239 Md. 119, 210 A. 2d 367 (1965).

The motion to dismiss the appeal is denied. We turn to the merits.

## II

The Appellee, Sarah Borinsky, and her brother Louis are the owners of a lot of ground situate in Baltimore City and known as 2649 Quantico Avenue, midway between Park Heights Avenue and Pimlico Road. The property was inherited by them from their deceased parents who acquired it in 1925 or 1926. At that time, the property was improved by 53 garages which were then rented to neighbors for the storage of automobiles. Ten of these garages have been razed and the remaining 43

are not being used save for nine or ten which are from time to time used by tradespeople for the storage of miscellaneous items. Practically all of the garages are dilapidated. The district in which the lot is located has always been zoned for Residential Use.

The lot is irregular in shape in that its width at its northern boundary line, fronting on Quantico Avenue, is approximately 115 feet, and it tapers down for a distance of approximately 297 feet so that at its south end it is only about 20 feet wide. This is the only lot of ground in the block on the south side of Quantico Avenue with frontage on Quantico Avenue. The lot of ground lies between two alleys. The entire eastern line of the lot binds on an alley running in the rear of the back yards of dwelling houses fronting on Pimlico Road. The property to the west, across the other alley, consists of converted houses used for commercial purposes, fronting on Park Heights Avenue.

The property to the west is in a First Commercial Use District. The property to the east is zoned Residential, as is the property to the north, except for a one-story masonry office and warehouse building on the north side of Quantico Avenue. This building was recently permitted by the Board by allowing an extension into the residential zone under the provisions of Section 14 of the Baltimore Zoning Ordinance. That section is not applicable to the property here involved, because the adjacent commercial zone to the west is separated from the property by an alley. Quantico Avenue is about 50 feet wide between the building lines to the north and south.

The Appellee filed an application with the Building Inspection Engineer to construct a one-story masonry building and warehouse on her property, similar to the building on the north side of Quantico Avenue. The Engineer has no legal power to permit an office or commercial use in a residential zone and refused the application. The Appellee appealed to the Board. In her appeal, she requested a special exception under Section 36 (b) and (c) of the Zoning Ordinance. The appeal was heard by four of the Board members, the fifth member being absent.

At the hearing before the Board, Louis Borinsky, the Appellee's brother and one of the owners of the property, testi-

fied that the garages on the lot are no longer rentable for the storage of private automobiles because of the size of modern cars, the fact that automobiles can now be parked on the streets, and the changes in the neighborhood. Some of the garages, however, an average of nine or ten, are rented for commercial uses other than the storage of cars, such as the storage of building materials. Mr. Borinsky testified he and his sister had tried to sell the property for residential purposes. "We have talked to agents on and off throughout the years and haven't had any success at all." In Mr. Borinsky's opinion, the lot cannot be sold or used for residential purposes.

Mr. Richard M. Hutman, a registered architect, testified on behalf of the Appellee that he found the site not feasible for residential construction, because of the shape and depth of the lot. He pointed out that the residences in the neighborhood are of a rowhouse type, built on lots approximately 15½ feet wide by 110 feet deep. The lot involved has an area of about 1700 square feet. In an area of this size, if it were rectangular, a developer might hope to get nine or ten family units. However, because of the triangular shape of the lot, only five houses could be built. Therefore, only slightly more than 52½% of the property is usable, whereas a developer building row houses would normally expect close to 100% use of the land. In response to a question from a member of the Board, Mr. Hutman admitted that the remaining "48%" of the land could be used for extended back yards or a park for the five houses, although the developer would only get a density of about 13.2 families per acre instead of the 27.3 families he would normally expect. It would be pleasant, Mr. Hutman thought, for tenants to have the additional 110 or 115 feet of backyard, but he doubted that it would be income producing to a developer. He would not advise a client to develop houses on the property.

Mr. Melvin Goldman, a developer and real estate expert, testified for the Appellee that he was familiar with the property and that Mr. Hutman had covered the situation adequately. He, Mr. Goldman, would not think of developing the tract if it were offered to him. In his opinion, it would be economically unsound and unwise to build houses on it; the use of the land for residential purposes would be "economic suicide." The oc-

·cupants of the houses in the residential portions of the general neighborhood have changed from homeowners to renters; the use of the houses on the west, fronting on Park Heights Avenue, has changed from residential to commercial; and there have been other changes to commercial in the neighborhood. In his opinion, it would be "most difficult" to secure financing for the construction of residential dwellings on the property.

After the hearing, two members of the Board voted to disapprove the application and two to approve it. In view of the requirement that at least four members of the Board must vote in favor of granting the permit for the Appellee to prevail, the application stood as disapproved. The effect of the Board's action was to leave the denial of the application by the Building Inspection Engineer in force. *Levy v. Seven Slade, Inc.,* 234 Md. 145, 148-152, 198 A. 2d 267 (1964) and cases therein cited.

The two members of the Board who approved the denial of the application relied upon four violations of the Zoning Ordinance shown on the face of the application: (1) a violation of Sections 9 and 10 of the Ordinance in that the proposed use was a prohibited one in a Residential Use District, (2) a violation of Section 13-H-1 of the Ordinance which prevents the changing of the garage buildings to any other form of non-conforming use, and which provides that where garage buildings have the status of non-conforming uses, such buildings may not be extended, expanded, enlarged or added to in any manner;[1] (3) a violation of Section 24 of the Ordinance in that the

---

1. Section 13-H of the Zoning Ordinance was passed by the Mayor and City Council of Baltimore as Ordinance 1162 and approved on April 4, 1962. It reads as follows:
"H. NON-CONFORMING STATUS OF CERTAIN USES
  1. Notwithstanding other provisions of this Article, any building or structure all or substantially all of which is designed and constructed for the storage or parking of privately owned passenger automobiles in a Residential and Office Use District or in a Residential Use District, may be continued for such use, and such use shall not have the status of a non-conforming use, and further, nothing herein shall be construed to permit the change of such use to any non-conforming use. Where such building, structure

application provided for 100 per cent lot coverage which would be in excess of the permissible 50 per cent; (4) a violation of Section 28 of the Ordinance in that the application showed that there would be no front yard setback as required by that Section.

The respective reasons for the votes of the members of the Board were given as follows:

> "The Board, in considering this case, reviewed the Court of Appeals' decision in Frankel versus the Mayor and City Council and Sapero versus the Mayor and City Council but, in the judgment of the Board, it was felt that this case does not come within the purview of these decisions. It was also observed that recently a non-conforming use provision was passed and set forth that garages cannot be changed to uses of any classification and must revert to residential use unless a non-conforming use is established. (Section 13). The Board, (two members) felt that the use of the premises for commercial purposes would have an adverse effect upon the neighborhood. Two of the members of the Board were of the opinion that a hardship does exist and that this case is similar to the previously cited Court of Appeals' cases mentioned above and that the evidence adduced at the public hearing warranted a finding favorable to the appellant.

---

or portion thereof is devoted to a use other than the storage or parking of privately owned passenger automobiles and the use is non-conforming, such non-conforming use may be continued subject, however, to the following provisions:

(a) that such building, structure or portion thereof shall not be altered in internal arrangement and no structural alterations shall be allowed in or to such building or structure for a use other than the storage or parking of privately owned passenger automobiles, except those required by law;

(b) that such non-conforming use shall not be changed to any other use except to the storage or parking of privately owned passenger automobiles;

(c) that such non-conforming use shall not be extended, expanded, enlarged or added to in any manner; * * *"

"In accordance with the above facts and findings, the Board disapproves the application." [2]

Judge Sodaro, of the Baltimore City Court, decided the case on the record made before the Board. In reversing the action of the Board, he held that the Board, in denying the exception asked by the Appellee, was in a legal sense arbitrary and capricious; and that the Appellee had met the burden of proving by clear and convincing evidence that she would be deprived of all reasonable use of her property under the present zoning.

These are the two legal issues presented on this appeal. We shall consider them in reverse order.

### III

The legal principles whose application determines whether or not the restrictions imposed by the zoning action on the property involved are an unconstitutional taking are well established. If the owner affirmatively demonstrates that the legislative or administrative determination deprives him of all beneficial use of the property, the action will be held unconstitutional. But the restrictions imposed must be such that the property cannot be used for any reasonable purpose. It is not enough for the property owners to show that the zoning action results in substantial loss or hardship. *Pallace v. Inter City Land Co.,* 239 Md. 549, 212 A. 2d 262; *DePaul v. Board,* 237 Md. 221, 227-29, 205 A. 2d 805 (1965) and cases therein cited. Where, as here, the facts are undisputed, the question is one of law, and the conclusion of the lower court is not entitled to the presumption of correctness which attaches to findings of fact. *Pallace v. Inter City Land Co., supra.*

In this case, all three of the Appellee's witnesses testified that, in their opinion, the property could not be economically or feasibly used for residential purposes. However, facts ad-

---

2. The Board voted 3 to 2 to request the City to appeal the decision of the Baltimore City Court. In his letter of November 12, 1964 to the City Solicitor, the Board's Chairman wrote:

"The Court's decision rests primarily on the Court of Appeals' decisions in the first Sapero case and the Frankel case. The Board disagrees with this position since it feels that the present case is clearly distinguishable."

duced by the evidence must also be considered. Some of the garages on the property have been and are being rented for the storage of building materials or personal property other than automobiles. Five row houses, similar to those in the immediate neighborhood, although perhaps with larger back yards or a small community park, can be built on the tract. While the structures to the west of the property, separated by an alley, are used for commercial purposes and there is an office and warehouse building on the north side of Quantico Avenue, the areas in the neighborhood immediately to the east and to the north are occupied almost entirely by residences.

There are, moreover, material gaps in the testimony of the Appellee's witnesses. It was not shown how much revenue is being derived from the rental of some of the garages for storage other than of automobiles. The Appellee intimates that this storage may not be permitted under present zoning, because there has been no determination that there is a non-conforming use. But the burden is on the Appellee to show that her property cannot be used for any reasonable purpose. Part of it, at least, brings in some income, and the Appellee has not affirmatively proved that this use cannot be legally continued. Section 13-H-1. of the Baltimore Zoning Law expressly provides that where any structure constructed for the storage or parking of privately owned automobiles is devoted to a use other than such storage or parking, then, if that use is non-conforming, (subject to certain conditions not here applicable) it may be continued.

The testimony that the property had been offered for sale for residential purposes, without success, was not supported by evidence of the price at which the property had been offered. The testimony that the building of the five row houses was not economically feasible was not supported by any evidence of the cost of the erection of such houses, the sales or rental value of the houses, if built, or the extent of the occupancy and the marketability of similar houses in the neighborhood. That real estate developers were not interested in the project does not necessarily mean that it was economically unfeasible for the property owners themselves to build one or more houses for sale or rental. There was no specific evidence that the owners had at-

tempted to finance the building of the houses and had been unsuccessful. Nor was there any evidence that the property could not be economically used for purposes other than individual residences, permissible under the present zoning, as, for example, a small apartment house, church or synagogue.

We have found a constitutional taking by zoning action on expert opinion testimony, when that opinion was factually supported. In the first *Sapero* case, *Baltimore v. Sapero,* 230 Md. 291, 186 A. 2d 884 (1962), the overwhelming commercialization of the area was undisputed, including an adjacent service station and shopping center across from the lot. In *Frankel v. City of Baltimore,* 223 Md. 97, 103, 162 A. 2d 447 (1960), we held that the opinion testimony was supported by "the uncontrovertible physical facts." The lot there involved was located on a corner of an arterial highway and another street, and was bounded on two sides entirely by parking lots and public and semi-public institutions, with a synagogue, a public parking area and a large public junior high school across the street; the lot had formerly been used as a bus station. However, when the expert opinion testimony was not supported by substantial factual evidence, we have held that general claims of economic unfeasibility are not sufficient to prove an unconstitutional taking. *Pallace v. Inter City Land Co., supra; Sapero v. M. & C. C.,* 235 Md. 1, 200 A. 2d 74 (1964) and cases therein cited. See also *Pahl v. County Bd. of Appeals,* 237 Md. 294, 297, 206 A. 2d 245 (1965).

In his opinion, in holding that there was an unconstitutional taking of the property in this case, Judge Sodaro found that *Frankel* was controlling. We disagree. It is true that the same expert witness who testified for the applicant in *Frankel* testified for the Appellee in this case; he was asked the same general questions as in *Frankel* and gave the same answers; indeed, he testified that if, as he had stated in *Frankel,* the use of the land there involved for residential purposes would be "economic suicide," it would "certainly be doubly true in this instance." However, even emphatic opinion testimony does not take the place of the necessary factual support. In *Frankel,* Judge Prescott, for the Court, relied largely upon the nature of the surrounding neighborhood. In that case, the property was

virtually an island in the midst of public and private institutions and parking lots; while there were five residences to the south, these were row houses not ordinarily permitted in the residential "E" zone there involved. In this case, as we have pointed out, while the areas to the west of the property are commercial and there is a commercial structure on the other side of Quantico Avenue, the area to the east and north are residential in nature. It is immaterial that many of the homes to the west are rented rather than owner occupied; if a property is used as a home, it is a residence irrespective of the nature of the legal interest of the persons who occupies it. It is true that in *Frankel* there was testimony that two semi-detached homes could be built upon the property, but there was strong evidence from the applicant's witnesses that residences could not be sold because of the nature of the neighborhood. In this case, as we have pointed out, not only is the nature of the neighborhood different from that in *Frankel,* but there is no specific evidence as to the cost or marketability of the five row houses which can be erected, nor any testimony that the property cannot be used for permitted non-residential purposes, while admittedly a portion of the property, even at the present time, and despite the dilapidation which the owners have permitted, brings in at least some revenue.

On the record and the authorities, we find that the Appellee has not sustained the burden of demonstrating that the present zoning of her property and the refusal of the Board to allow an exception constitute an unconstitutional taking.

## IV

The refusal of a zoning board to permit an exception or variance, if arbitrary, unreasonable or discriminatory, may be illegal, even though there is no unconstitutional taking. *Baltimore v. Sapero, supra.* However, if there was substantial evidence to support the Board's decision, its action will be upheld; a court will not substitute its judgment for that of the Board as to the wisdom or soundness of the action taken; it is only where the question decided is not fairly debatable that the decision will be declared invalid. *Sapero v. M. & C. C., supra; Montgomery Co. v. Scrimgeour,* 211 Md. 306, 312, 127 A. 2d

528 (1956); *Offutt v. Bd. of Zoning Appeals,* 204 Md. 551, 562, 105 A. 2d 219 (1954) and cases therein cited.

In this case, in denying the application for an exception, the Board relied upon four violations of the Zoning Ordinance shown on the face of the application. It is clear that these violations exist. From our discussion of the issue of unconstitutional taking, it follows that the Board could reasonably have found from the testimony and the inferences fairly deducible therefrom, that, under the present zoning, the Appellee can derive some income from her property. The Appellee, nevertheless, was entitled to the exception if she proved practical difficulties or unnecessary hardships, or the peculiar topography of her tract, which entitled her thereto. To sustain this burden, she must show that her plight is due to unique circumstances and not to general conditions in the neighborhood. *Penn Construction Co. v. Baltimore City,* 233 Md. 372, 376-77, 196 A. 2d 879 (1964); *Marino v. City of Baltimore,* 215 Md. 206, 219, 137 A. 2d 198 (1957) and cases therein cited.

That the Appellee's property is adjacent to commercial areas to the west and that there is a business structure on the other side of Quantico Avenue is not enough. As we pointed out in *Marino,* at 215 Md. 222, if the neighborhood is gradually changing as a result of additional commercial use, the City Council may have the power to extend the adjacent commercial district to include the property involved, but that is a legislative, not a judicial function.

It is unnecessary for us to add to what we have said above as to our holdings that mere financial hardship or an opportunity to obtain an increased return from the property is not sufficient to show the zoning action is illegal. The topography of the Appellee's tract, because of its triangular nature, is such that only slightly more than one-half of her ground can be used for row houses. But even if this circumstance reduces the value of her property under its present zoning to one-half or less of what the worth would be if the exception were granted, that is not enough to make the Board's refusal illegal. In *Marino,* there was testimony that the commercial value of the property was ten times that for residential use; we held that the application for the erection of a store building was not illegally de-

nied. See also *Greenblatt v. Toney Schloss*, 235 Md. 9, 200 A. 2d 70 (1964).

Nor does the fact that the original use to which the property was put, the renting of the garages for the storage of private automobiles, is no longer feasible, entitle the Appellee to the relief she prayed. It was admitted in the argument that there are many properties throughout the city, in residential use districts, which are occupied by garages which have become obsolete. That a non-conforming use [3] is no longer profitable does not mean that the property owner is entitled to an exception or variance. As we pointed out in *Grant v. City of Baltimore*, 212 Md. 301, 307, 129 A. 2d 363 (1957), "the earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned." Here, as we have found, the Board could well have determined, as in effect it did, that there was some income-producing use of the property possible within the residential zoning, even though the majority of the garages can no longer be used for their original purpose.

The City contends, and the Appellee denies, that Section 13 of the Zoning Ordinance as enacted in 1962 makes inapplicable the authority of the Board to grant exceptions as to garage buildings located in residential use districts. We do not reach that question. We hold that, assuming *arguendo* that the Board's power to grant exceptions was unchanged by the 1962 Ordinance, the question of whether to grant or deny the exception was fairly debatable, that the Board's denial was not arbitrary, unreasonable or discriminatory, and that the court below erred in reversing the Board's action.

> *Motion to dismiss appeal denied; order reversed; case remanded for the passage of an order affirming the action of the Board; appellee to pay the costs.*

---

3. The history of the zoning law and decisions as to the status of garages prior to the passage of the 1962 Ordinance, excerpts of which are in footnote 2, supra, is set forth in Higgins v. City of Baltimore, 206 Md. 89, 110 A. 2d 503 (1955).

BARNES, J., filed the following dissenting opinion.

I agree with the Court's ruling on the appellee's motion to dismiss the appeal but I cannot agree with the Court's decision on the merits.

In my opinion Judge Sodaro, in his carefully considered opinion in this case, was correct in holding that the case at bar is controlled by our decision in *Frankel v. Mayor and City Council of Baltimore,* 223 Md. 97, 162 A. 2d 447 (1960), and that "the factual situation is not merely one of hardship, but of a taking in a constitutional sense." Indeed, in my opinion, the case at bar is factually a far stronger case to establish an unconstitutional taking than was the factual situation in *Frankel.*

In the *Frankel* case, the property involved was 5616 Park Heights Avenue, Baltimore, Maryland. It was located at the southwest corner of Park Heights Avenue at its intersection with Manhattan Avenue. The lot was an irregular one with a frontage of 149.27 feet on Park Heights Avenue tapering from a width at its northern end of 56.2 feet to a width of 92.25 feet at its southern side. It was in a Residential Use, E Area District. The lot had, at one time been used by the Baltimore Transit Company, and at the time of Dr. Frankel's application in 1958 to construct a two-story and basement professional office building on the property, there was an abandoned bus terminal and waiting station 12 feet by 20 feet, containing plumbing fixtures previously used as a comfort station for employees of the Baltimore Transit Company and as a depository for various vending machines. To the east of the Frankel property were the Synagogue of the Beth Jacob Congregation (an orthodox Hebrew congregation), located north of Manhattan Avenue, and the Pimlico Junior High School, located south of Manhattan Avenue. To the north of the Frankel property, the Associated Jewish Charities planned to construct a Jewish Community Center with a large parking lot on the northwest corner of Park Heights and Manhattan Avenues. Farther north, the Baltimore Hebrew College had been erected. To erect these new buildings, residential cottages had been demolished. South of the Junior High School, Northern Parkway had been built. On the south of the Frankel property there were five row houses

fronting on Park Heights Avenue so that the side of the adjacent row house was parallel to the south property line of the property. During the 10 to 15 years preceding the filing of Dr. Frankel's application the neighborhood had gradually changed from a residential cottage-type use to either commercial uses or the institutional uses mentioned. It was contemplated that the structure on the property be razed to permit the erection of the masonry professional office building which would be 100 feet by 40 feet, with two stories and a 25 foot basement. There were both use and area violations presented by the application and Dr. Frankel applied for an exception or variance under Section 36, subsection (b) and (c) of the Baltimore City Zoning Ordinance.

Melvin Goldman, a well qualified real estate expert and a developer of residential property himself, testified for Dr. Frankel. (Mr. Goldman is the same expert who testified for the applicants in the case at bar). His testimony in the *Frankel* case is summarized by Judge Prescott, speaking for the Court, as follows:

> "After testifying to the changes in the neighborhood, he stated that their combined effect is 'overwhelming evidence of the tremendous change that has taken place in the neighborhood within recent years.'
>
> "He also testified that due to the changes in the neighborhood, the existence of the commercial, institutional and office uses and the irregularity of the land, it would be highly impractical to attempt to develop this property by the erection of residences thereon, that it could not reasonably be used for residential purposes, and it would be economically unsound for a developer to undertake to erect residences on the property, as it was a very unlikely and unsatisfactory site for dwellings. He added that any attempt to develop the lot for residential purposes would be 'sheer economic suicide.' " (pages 101-102 of 223 Md.).

There was also testimony by a financial advisor to building associations that although an application for financing for residential development of the Frankel property would be consid-

ered, he did not believe that a mortgage for residential construction would be granted. An architect testified that although it would be possible to erect residences on the Frankel property, "due to the irregularity of the lot and set backs it would not be feasible for residences." Another well qualified real estate expert, A. Gordon Gilbert, testified that "the property is unsuitable for residential purposes, although it is zoned for residential purposes" and that in his opinion the Frankel property "surrounded by such uses, * * * would not be saleable for residential purposes, if so improved, or if saleable would be saleable at such a price as to reflect no value in the land." He testified that he could assign no value to the land for residential purposes.

Unlike the case at bar, however, there was a substantial protest from the Synagogue and the neighboring residential property owners (15 of whom appeared and testified at the hearing before the Board against granting the application) and there was substantial testimony in the lower court by a real estate expert that two semi-detached houses 16 feet by 31.6 feet, or two cottages, 20 feet by 30 feet, could be built on the subject property and that these would be saleable in the vicinity of $9000 to $11,000 subject to an annual ground rent of approximately $2000. This same expert testified that residences had within the two-year period prior to the application been erected on Ken Oak Road (less than one block to the southeast of the Frankel property) and sold. The City's expert also testified that there would be a market for the sale of residences erected on the Frankel property resulting from those members of the Beth Jacob Congregation who because of the tenets of their faith in regard to travel on the Sabbath, wished to live within walking distance of their place of worship. *This testimony was accepted by the trial court in Frankel and the action of the Board* (unanimous and not divided two to two as in the case at bar), *was affirmed* by the trial court. In *Frankel,* we held that there was an unconstitutional taking of Dr. Frankel's property because "the uncontrovertible physical facts support the testimony given, and the conclusions reached, by the appellant's experts * * * and clearly show that the present zoning ordinance restricts the use of the Frankel property so that it can-

not, within the sphere of its present zoning classification, be used for any reasonable purpose. When this occurs, zoning goes beyond permissible and legal regulation and must yield to the rights of the property owner." (Page 103 of 223 Md.).

In the case at bar, the plat introduced into evidence shows that the subject property is irregular in shape. It is triangular, with a frontage of approximately 115 feet on Quantico Avenue, and it becomes sharply narrower as it runs southerly from Quantico Avenue for a distance of more than 200 feet, until its southern boundary is only 20 feet. It has a far more extreme triangular shape than Dr. Frankel's property. It is the only lot on the south side of Quantico Avenue which has frontage on that Avenue. Directly across Quantico Avenue to the north there is a one-story masonry office and warehouse building permitted by the Board under the provisions of Section 14 of the Baltimore City Zoning Ordinance which gives power to the Board to grant a First Commercial Use within 100 feet of an existing First Commercial Use District provided that distance does not cross a street or alley. The applicants in this case applied for substantially the same type of building and use and have used the warehouse building directly across Quantico Avenue to the north as a model for their application. But for the presence of the 15 foot alley which is immediately adjacent to the First Commercial Use District to the west of the subject property, the Board would have power to grant the applicants relief like that granted the applicant across the street. There is a 10 foot alley to the east of the subject property. The rear yards of the two-story rented dwelling houses (which front on Pimlico Road) run to the east side of this 10 foot alley.

As pointed out in the majority opinion, the subject property was purchased by the parents of the applicants in 1925 or 1926 and garages were built in a Residential Use District for the parking of automobiles. They were non-conforming uses when the first comprehensive zoning ordinance was passed in Baltimore City in 1931. Ten of the original fifty-three garages have been demolished, so that forty-three remain. The remaining garages are in very poor condition and show evidences of vandalism and lack of a productive economic use. The improvements on the properties to the west of the subject property

were originally built as residences, but now have commercial uses. Their rear yards adjoin the 15 foot alley to the west of the subject property. The property at the southeast corner of Park Heights and Quantico Avenues—the rear yard of which adjoins the 15 foot alley—is used as a butcher shop. The basement of the property on the southwest corner of Quantico Avenue and Pimlico Road is used as a butcher shop, fish market and produce market. Its rear yard runs to the 10 foot alley on the east of the subject property. Fortunately there is an informative plat and four excellant photographs in the Appendix which clearly show many of the relevant physical facts in regard to the subject property and the surrounding properties.

Louis Borinsky, one of the owners, testified that after the City permitted automobiles to be parked on the streets during World War II, the use of the garages dropped off 50%. Thereafter automobiles became larger and "now these garages cannot be used for the average modern car because of their size." He testified that the character of the neighborhood had changed and the people who live in the neighborhood "simply don't rent garages and couldn't get their cars in them even if they wanted to. So, it is an impossible situation from all points." He also testified that the subject property could not be sold or used for residential purposes and that the applicants "have tried from year to year, and simply cannot"; the subject property has been offered for sale, they have "talked to agents on and off through the years and haven't had any success at all"; and "Nobody is interested in it for residential use whatsoever." He also testified that 9 or 10 of the garages are rented from time to time for the storage of miscellaneous items such as to a roofing man, "a loner," who might store roofing materials for a few months, but they "leave all their stuff there and that is the end of them." There has been considerable vandalism in recent years and the remaining garage buildings in their present condition "offer some damage to the community." Mr. Borinsky also testified that on the other side of Park Heights Avenue, fronting on Quantico Avenue, there were formerly garages of the same sort and that they were now warehouses, a chicken killing establishment and a used car lot. All of this testimony—and indeed all of the testimony in the case—is uncontradicted.

As already indicated, Melvin Goldman, the same well qualified real estate expert who testified in the *Frankel* case, also testified for the applicants in the case at bar. His testimony is accurately and succinctly summarized by Judge Sodaro in his opinion in the lower court as follows:

"This piece of property, if it were offered to me, I, as a developer, simply would not think of developing it * * * my experience, through the years, this property has been offered to developers for residential development * * * as much as ten years ago * * * at that time the market was a little bit different * * * and even at that time, the general character of the neighborhood was such that the average developer, to whom it was offered, rejected it for residential construction. So, the conditions in recent years in the neighborhood have become such that it is my opinion that no sound developer would undertake to develop residences on this tract * * * to build houses there would, in my opinion, just be economically unsound and unwise * * * I am not given to repeating phrases, but if I was asked to use this precise phrase (economical suicide) with this property, I would say that if it were true in the case of the Frankel land, which is located at Park Heights Avenue and Northern Parkway, it would certainly be doubly true in this instance. There is no comparing the two locations * * * primarily, going back to just after the war, the east side of Park Heights Avenue adjoining Quantico Avenue was residential and it was beginning to turn, house by house, to commercial use at that time. Since that time, I believe that all of the property or about all of the property fronting on Park Heights Avenue is in commercial use * * * the warehouse across the street from this property has been erected, and I note the increased use of the property on Pimlico Road, which lies on the east side of Pimlico Road * * * the homeowners have moved away from the neighborhood * * * it has changed from a homeowners neigh-

borhood to a neighborhood of renters, * * * and the garages themselves have deteriorated to a point where I actually consider them a menace * * * that the City would benefit by their removal and the erection of a substantial warehouse type of building. * * * There is no market that I am aware of for garages, particularly since when the change of the size of the cars * * * I don't think the present day cars could even maneuver into these garages.'

"Mr. Goldman then stated that the property could not be reasonably used for the construction of residential properties; that it would be economically unsound, and on an unsatisfactory site; that the attempt to develop this lot for residential purposes would be 'sheer economic suicide'; that financing for the construction of residential dwellings would be most difficult."

Richard M. Hutman, a well-qualified architect, testified that although perhaps 5 row houses could physically be built on the subject property, only $52\frac{1}{2}\%$ of the property is usable and he was of the opinion that to build such row houses "would be a very foolish action, and I would never advise a client to develop houses on this property." He further stated:

"The property across the street has been pointed out as a warehouse. Bounded on the two sides and also the rear is an alley. There is no particular attractive outlook and on the contrary, I would say it is a rather ugly situation. I frankly don't see any reason why a person would want to build a residential [residence] on this property."

There was no protest from any one at the hearing before the Board. As indicated, all of the testimony was that on behalf of the applicants and all of the testimony was uncontradicted.

It seems clear to me that Mr. Goldman's statement that if it would be "economic suicide" to build residences on the Frankel land "it would certainly be doubly true in this instance" is a conservative statement. In the *Frankel* case the

Synagogue, Junior High School and the Jewish Community Center are all compatible uses with a possible residential use. Indeed the trial court in *Frankel* approved the testimony of the City's real estate expert and found as a fact that the presence of the orthodox Synagogue would *create a market* for residential properties. Residences had actually been recently built and sold on Ken Oak Avenue, less than a full block away from the Frankel property. The Synagogue, the Junior High School and the Jewish Community Center buildings are all attractive and well-built structures. In the case at bar, however, a prospective residential builder would face a warehouse building to the north, the rear yards of butcher shops to the immediate east and west, the rear yards of other commercial properties to the west and additional rear yards of rented residential properties to the east. The long and acutely triangular property simply cannot be used for residential use or for apartment houses, synagogues, churches or any other use now permitted by the existing zoning restrictions. In my opinion, the "uncontrovertible physical facts" support the uncontradicted testimony and compel this conclusion. To hold otherwise seems to me to lose touch with economic reality. For the constitutional guarantee against the taking of private property for public use without just compensation to be effective, it must be applied firmly on the earth and not in the clouds. As Judge Collins, for the Court, so aptly pointed out in *Hoffman v. City of Baltimore,* 197 Md. 294, 306, 79 A. 2d 367 (1951):

"* * * the duty of the courts not to substitute their judgment for the judgment of legislative or administrative authorities acting within their powers is no more imperative than the power and duty to set aside any purported exercise of such power which is in fact arbitrary, capricious or confiscatory. In this respect zoning can no more escape judicial review than any other purported exercise of the police power."

It may be added that the issue of an unconstitutional taking may be raised and considered by the Baltimore City Court upon an appeal from the Board denying a special exception, although generally the issue is raised and decided in an equity

suit in which the application of the zoning ordinance to the particular piece of property is directly challenged. *Hoffman v. City of Baltimore, supra,* (see page 305 of 197 Md.).

The majority seeks to distinguish the case at bar from the *Frankel* case on the grounds that there was no showing how much revenue was being derived from the rental of some of the garages, that the price at which the subject property was offered for sale was not stated, that there was no specific unsuccessful attempt to finance the building of houses given and that there was no evidence that the subject property could not be economically used for other permissible purposes such as a small apartment house, church or synagogue. But there was no such proof as this in the *Frankel* case, for the same good reason as here, that the "uncontrovertible physical facts" make such testimony unnecessary. Any income the applicants may derive from the sporadic and uneconomic use of a few of these deteriorated garages, in my opinion, cannot result in a sufficient return on the subject property to prevent a holding of an unconstitutional taking by the operation of the present zoning restriction on the subject property. This necessarily limited revenue is not derived from residential uses and even this very limited use may *possibly* be prohibited by the provisions of Ordinance of the Mayor and City Council of Baltimore, No. 1162, approved April 4, 1962, upon the validity of which and its application to the subject property, however, no opinion is expressed.

In my opinion, also, the uncontradicted evidence before the Board and the uncontradictable facts already set forth, made the Board's action in declining to permit the exception or variance requested, arbitrary, unreasonable and discriminatory, as the questions to be decided were not fairly debatable upon the facts before the Board which required that the application be granted. See *Mayor and City Council of Baltimore v. Sapero,* 230 Md. 291, 296, 186 A. 2d 884 (1962) and *Offutt v. Board of Zoning Appeals,* 204 Md. 551, 562, 105 A. 2d 219 (1954).

I would affirm.