MONTGOMERY COUNTY, MARYLAND *v.*
LAUGHLIN ET UX.

[No. 69, September Term, 1969.]

*Decided December 5, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Richard S. McKernon, Assistant County Attorney,* with whom were *David L. Cahoon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for appellant.

*C. Edward Nicholson* for appellees.

BARNES, J., delivered the opinion of the Court.

Montgomery County, the appellant in this appeal, contends that the Circuit Court for Montgomery County (Shure, J.) erred in passing its order of March 4, 1969, reversing the decision of the County Council of Montgomery County, sitting as a District Council, dated July 9, 1968, which refused the application to reclassify the 5.0084 acre tract in the Kensington area of Montgomery County on the west side of Drumm Avenue between Plyers Mill Road and Oberon Street, in the thirteenth election district, owned by the appellees, Henry P. Laughlin and Marion P. Laughlin, his wife, from the existing R-60 (One-family, detached residential) zone to the R-T (Town houses) zone. The lower court was of the opinion (1) that the issue in regard to whether or not the reclassification to the R-T zone should be granted was not

fairly debatable in that there being no legally sufficient evidence to support the District Council's decision, it was arbitrary, unreasonable and capricious, thus denying the property owners due process of law and (2) that to deny the reclassification would result in an unconstitutional taking of the subject property without just compensation in that no reasonable use of the subject property could be made under the existing R-60 zoning. We agree with Montgomery County's position that the lower court erred and we will reverse that court's order of March 4, 1969.

The subject property is an irregularly shaped lot with frontage on Plyers Mill Road, Oberon Street and Drumm Avenue. The Montgomery County Hearing Examiner in describing the 5.0084 acre tract stated that it "vaguely resembles a hatchet with the blunt end of the head of the hatchet on Plyers Mill Road, the cutting edge on Oberon Street and the base of the handle on Drumm Avenue." The frontage on Plyers Mill Road is approximately 425 feet; on Oberon Street is approximately 175 feet; and on Drumm Avenue is approximately 100 feet. The subject property has been in the R-60 zone since the Comprehensive Zoning in 1954. The remaining property between the three streets and the subject tract is also in the R-60 zone and is entirely developed with single-family houses. To the north of the subject property across Plyers Mill Road is an 11 acre tract for which the Board of Appeals of Montgomery County has granted a special exemption for the operation of a horticultural nursery. The remaining properties in every direction from the subject property are in the R-60 zone and are developed with single-family residences. The Hearing Examiner, after a visit to the site on June 10, 1968, reported to the District Council that, in his opinion, the neighborhood surrounding the subject property was a stable, single-family, residential neighborhood with homes priced in the $15,000 to $30,000 range.

The owners, prior to the filing of the present application, filed an application for R-10 (Multiple-family, high-

density residential) zoning for the subject property which was refused by the District Council on September 8, 1964. The present application (No. F-57) was filed on May 31, 1967, and requested reclassification from the existing R-60 zone to the R-30 (Multiple-family, low-density residential) zone *or* to the R-T zone. Inasmuch as the lower court sustained the denial of the District Council of the R-30 zoning and there is no cross appeal by the applicants from this decision, the present appeal is confined to the reversal by the lower court of the District Council's denial of the R-T zoning.

The Technical Staff of the Maryland-National Capital Park and Planning Commission (Planning Commission) issued its report on April 4, 1968, recommending denial of the R-T zoning requested by the applicants. This report pointed out that the Technical Staff had previously recommended denial of R-10 zoning for the subject property because it was completely surrounded by single-family homes and such zoning would be detrimental and inharmonious with the existing uses. The Technical Staff concluded that the requested zoning in the present application did not conform to the adopted Kensington and Vicinity Master Plan and recommended that the request for R-T zoning be denied with permission to the applicants to withdraw their application pending the adoption of a revised Master Plan.

On April 18, 1968, the Planning Commission, with two members absent, unanimously voted to recommend to the District Council that the requested R-T zoning be denied for the reasons set forth in the report of the Technical Staff and also stated that in the Planning Commission's opinion "the proposed rezoning is not compatible with the surrounding area, and, therefore, does not fulfill the requirements of the R-T zone." The Planning Commission also recommended that the applicants be permitted "to withdraw the application, without prejudice."

The public hearing on the application was held before the Hearing Examiner on May 10, 1968. At that hearing

the applicants submitted a site plan for the proposed R-T development. The site plan showed seven groups of town houses, six groups containing eight units and one group, four units—a total of 52 units with parking spaces for 80 automobiles with access to Oberon Street only. The applicants produced as an expert witness, A. Morton Thomas, Jr., a land planner, who testified that traffic would diffuse from Oberon Street in a northerly direction to Plyers Mill Road or south to Metropolitan Avenue using various secondary residential streets in the neighborhood in such a way as to avoid congestion of the streets in the immediate vicinity of the subject property by additional automobiles generated by the 52 proposed town houses. Mr. Thomas testified that Oberon Street is a secondary residential street which had a right-of-way of 50 feet with a paved width of 26 feet. The Hearing Examiner, who, as we have indicated, made a site inspection, stated in his report that there were no sidewalks on Oberon Street or on many of the streets in the surrounding areas and most of the homes are not provided with off-street parking. The protestants produced evidence of various property owners in the neighborhood of the subject property who testified that there were no sidewalks on Oberon Street; that automobiles parked on both sides of the street, and that these conditions made it dangerous for children walking to school; that cars going in opposite directions on Oberon Street could not pass one another because the automobiles parked on both sides of the street; and on one occasion the automobile of one of the witnesses was struck when two automobiles tried to pass each other on that street; that one witness had made traffic counts on Oberon Street and, in his opinion, the proposed R-T development would double traffic on that street; and that traffic was very heavy on Plyers Mill Road and on Drumm Avenue and that any additional traffic would be very hazardous for children walking to school.

At the hearing, the Hearing Examiner asked Mr. Thomas if it would not be wiser to have access from the

proposed development to Plyers Mill Road, which has 40 feet of paved road surface, rather than to have the access to Oberon Street which has only 26 feet of paved surface. Mr. Thomas, although pointing out that Plyers Mill Road is a primary collector street for the homes in the area and that the residents of the area would attempt to gain access to Plyers Mill Road from Oberon Street and other secondary residential streets in the area as rapidly as possible, never did state why it would not be feasible for the applicants to provide access to Plyers Mill Road. One of the witnesses for the protestants, however, testified that any entrance from the subject property to Plyers Mill Road would be dangerous in that the entrance would be obscured from on-coming traffic due to the very steep grade of the road and a turn at the base of the grade. He stated that just a few minutes prior to the hearing, there had been "a rather nasty accident between a school bus and a D.C. Transit bus on that hill." He stated further that there were serious traffic tie-ups already existing on Plyers Mill Road, particularly in the winter season and during the rush hours. Mr. Thomas admitted: "I am very well aware of the grade—very well aware of the steep curve coming up there."

Mr. Thomas was of the opinion that no traffic congestion would be created by the development either in the R-T or the R-30 zone, and gave his reasons.

At the hearing, the applicants submitted a site plan for R-60 development which showed a maximum of 14 single-family lots which could be obtained from the subject property as contrasted with a maximum of 18 lots for single-family homes on a regularly shaped tract of the same size as the subject property without the unusual topography of the land in question. Mr. Thomas testified that the subject property is quite rough and wooded. It is traversed from east to west by a tributary of Rock Creek that flows into a large concrete flume running in a north-south direction along the western end of the property. Mr. Thomas, however, conceded that homes had been built in Montgomery County on land

with topography comparable to that existing on the subject property. Mr. Thomas testified that, in his opinion, in order to develop 14 single-family homes on the land in question it would be necessary to obtain slope easements from adjacent property owners *or* if these easements could not be obtained, it would be necessary to construct a retaining wall at a cost of approximately $12,000.

The applicants called as an adverse witness, Lewis Elston, Chief of the Division of Zoning and Planning Administration of the Planning Commission. Mr. Elston was examined in regard to the statement in the Technical Staff Report that:

> "This five-acre parcel is a remnant of the adjacent subdivided land; thus it appears to have been left in its present undeveloped, natural state because of its rough topography. The Commission recognized its difficult terrain and indicated this property as a 'conservation area' on the Kensington-Wheaton Land Use Plan. A 'conservation area' pertains to small stream valleys not necessarily suitable for active park use but which should be kept open for drainage and conservation purposes, and can be in either public or private ownership. Since this property consists primarily of a drainage channel, it would be particularly appropriate for such use."

Mr. Elston, in explanation of this language, stated:

> "The conservation areas where we indicate such on master plans are intended to suggest that while possibly it may be acquired as public park, it also is possible that it will remain in private ownership. In this latter case, the plan suggests that it be used in a manner which will preserve the natural conditions around the stream in order to conserve land and water resources."

He further testified that he was of the opinion "that

this parcel is usable in part for single family homes" and that he based his opinion "on the fact that a number of plats were submitted in the previous zoning case on this land, No. C-1389, showing various numbers of single family lots which I believe two different land use planners submitted as possible methods of development." Mr. Elston confirmed, as true at the time of the hearing, the statement in the Technical Staff report:

"The Park Department has neither funds nor plans to acquire the property for park use for there are already three or four park areas close by."

Although Mr. Thomas stated he "would question whether construction loans could be obtained for the development of the type of homes [single-family homes] that would be going down there," no financial expert stated that no such loans would be available for the construction of single-family homes and there was no showing that any applications had been made for such loans and refused.

In the report of the Hearing Examiner, it was concluded that the "additional traffic generated by the R-T development of the subject tract would be detrimental to the best interests of the citizens of this neighborhood." He recommended to the District Council that the application for reclassification to the R-T and R-30 zones be denied.

In the written opinion of the District Council, filed July 9, 1968, the determinations of the Hearing Examiner were recited together with his conclusion that "the requested R-T zone was not compatible with the conditions which exist today in this neighborhood." The District Council, as we have indicated, denied the applications for reclassification to both R-30 and R-T zones.

(1)

In our opinion the denial by the District Council of the requested reclassification from the R-60 zone to the

R-T zone was fairly debatable and did not deny the applicants due process of law as being arbitrary, unreasonable or capricious. Our decision in *Tauber v. Montgomery County Council,* 244 Md. 332, 223 A. 2d 615 (1966), cited with approval and followed by us in *O. F. Smith Brothers Development Corp. v. Montgomery County Council,* 246 Md. 1, 227 A. 2d 1 (1967), is dispositive of this issue. In *Tauber,* we sustained a denial by the District Council of an application for R-H zoning (like the R-T zoning, a "floating" zone) for property located at the northeast quadrant of the intersection of Massachusetts and Westbard Avenues in Bethesda, Montgomery County. The District Council found that the proposed apartment house would not be compatible with the surrounding area because it would create an unwarranted traffic hazard. We held that the issue in regard to the traffic hazard was fairly debatable. We stated:

> "The Technical Staff of the Maryland-National Capital Park and Planning Commission recommended approval of the application but the Montgomery County Planning Board declined to accept this recommendation and recommended denial because in its opinion the request for rezoning was premature and would create 'a potentially hazardous and undesirable traffic situation.' At the hearing on July 30, 1964, before the District Council, the applicants presented expert testimony indicating that the proposed development would not generate sufficient traffic to have a significant effect upon the operational safety of the adjacent streets. This opinion, however, was based upon a traffic count for one hour in the morning and one hour in the afternoon of February 7, 1964, at the intersection of Massachusetts Avenue and Westbard Avenue. Certain witnesses for those protesting against the granting of the application, testified that there were severe traffic conditions at

the intersection. One witness testified that at times the traffic was backed up from the intersection in both directions for over one-half a mile and that there had been a number of accidents at what he described as a traffic bottleneck. There was other testimony on behalf of the protestants indicating a dangerous traffic condition at the intersection which would be aggravated by the erection of the proposed apartment house. At the time of the hearing neither the widening of Massachusetts Avenue, nor the extension of Little Falls Parkway (both single-lane highways) were immediately contemplated.

\* \* \*

"The appellants contended in the lower court and before us that the action of the District Council in denying the requested rezoning was arbitrary, unreasonable and capricious allegedly because there was insufficient evidence before the District Council to make its denial fairly debatable. We agree with the lower court that the issue before the District Council was whether the R-H zone was compatible with the surrounding area and that there was sufficient evidence before the District Council from the report of the Planning Board and the testimony of the protestants in regard to the traffic hazard to make that issue fairly debatable."
(244 Md. at 335-36; 223 A. 2d at 617-618)

As in *Tauber,* the evidence in the present case was sufficient to make fairly debatable the issue in regard to whether or not the proposed R-T development would create a traffic hazard. Mr. Thomas, the expert land planner who testified for the applicants, stated that Oberon Street to which there would be sole access to and from the proposed R-T development, had a *paved* width of only 26 feet. Mr. Thomas admitted that Plyers Mill Road— suggested by the Hearing Examiner as a possible alterna-

tive access to the subject property—only had a paved width of 40 feet and that a recent traffic count made by Montgomery County showed an average total for 24 hours of 5,609 automobiles. Mr. Thomas further stated that the rated capacity for Plyers Mill Road is between 6,000 and 8,000 automobiles. He admitted that cars must park on both sides of Oberon Street and that he was well aware of the fact that Plyers Mill Road had a very steep grade and a sharp curve near the portion of the subject property from which the suggested alternative access could be provided to that road.

The residents in the vicinity of the subject property testified in regard to the dangerous traffic conditions observed by them on Oberon Street and Plyers Mill Road. We have given the substance of their testimony earlier in the opinion and need not repeat it here. In *Tauber* the expert witness for the applicants in that case had made traffic counts; in the instant case no such traffic counts were made by the expert witness who testified for the applicants. Indeed, the only traffic counts made in the present case were those made by one of the witnesses for the protestants who testified in opposition to the granting of the application. The Hearing Examiner in the present case personally made an inspection of the area surrounding the subject property. He concluded that until such time as the interior streets in the area are widened to provide better traffic conditions, sidewalks are provided for the safe passage of children going to and from school and the parked cars removed from the streets by providing off-street parking for the single-family homes, the increased traffic generated by the proposed R-T development would not be "compatible with the best interests of the neighborhood." In our opinion the facts in regard to the traffic hazard were stronger for the applicants in *Tauber* than they are in the present case. We conclude that the issue in regard to the traffic hazard was fairly debatable and that the action of the District Council in finding that the proposed development was not compatible with the surrounding area was not

arbitrary, unreasonable and capricious. In our opinion, the lower court was clearly in error in not sustaining the action of the District Council on that issue.

## (2)

The applicants contend, however, that to deny them the requested reclassification would result in an unconstitutional taking of their property for public use without just compensation because no reasonable use of the subject property could be made under the existing R-60 zoning. We disagree with this contention and again find that our decision in *Tauber, supra,* cited with approval and followed by us on this point in *Montgomery County Council v. Kacur,* 253 Md. 220, 229, 252 A. 2d 832, 837 (1969), dispositive of this issue. We stated in *Tauber:*

> "The appellants [applicants] also contended below and before us that they were denied all reasonable use of the subject property by the existing R-60 zoning and were thus deprived of their property without due process of law or the payment of just compensation. In the R-60 zone, in addition to one-family detached dwellings, various institutional uses are permitted, including churches and other places of worship, libraries, museums and publicly owned buildings. Although there was evidence indicating that the subject property could not be reasonably used for one-family detached dwellings, it is clear from our decisions that to establish unconstitutionality of existing zoning because of a denial of *all* reasonable use of the subject property, the owner must establish that the property cannot reasonably be used for any of the permitted uses in the existing zone. *Mayor and C. C. of Baltimore City v. Borinsky,* 239 Md. 611, 624, 212 A. 2d 508, 515 (1965). This the applicants failed to do."
> (244 Md. at 337; 227 A. 2d at 618)

Like *Tauber,* the applicants made no effort to show that the subject property could not be used for *any* of the permitted uses in the R-60 zone. Indeed, the testimony and exhibits introduced by the applicants, as we have already pointed out, showed that portions of the subject property *could be used for single-family development* permitted in the R-60 zone. Mr. Thomas testified that 14 of the permitted 18 lots for single-family development could be laid out for the subject property. Mr. Elston, a planner employed by the Planning Commission as Chief of the Division of Zoning and Planning Administration and called as an adverse witness by the applicants, testified that in his opinion, the subject property was "usable in part for single family homes" and indicated that in a previous zoning case involving the property in question, plats had been introduced by two different land use planners showing various numbers of single-family lots for the subject property. This evidence is a far cry from that required by our previous decisions to establish a taking of property for public use without the payment of just compensation. *Kacur, supra; Tauber, supra;* and *Mayor and City Council of Baltimore v. Borinsky,* 239 Md. 611, 624, 212 A. 2d 508, 515 (1965). In our opinion, the lower court was clearly in error in deciding this issue in favor of the applicants.

> *Order of the Circuit Court for Montgomery County of March 4, 1969, reversed and order of July 9, 1968, of the County Council of Montgomery County, sitting as a District Council, denying the requested rezoning reinstated; the appellees to pay the costs.*